UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S1-4:15 CR 230-1 JAR (JMB) |
| | ) | |
| JACOBI R. TEMPLE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM, REPORT, AND RECOMMENDATIONS OF
UNITED STATES MAGISTRATE JUDGE – MOTIONS TO SUPPRESS**[1]

Currently before the Court are several motions to suppress filed on behalf of Defendant Jacobi R. Temple.  In particular, Temple has filed a Motion to Suppress Statements (ECF No. 228), a Motion to Suppress Identification (ECF Nos. 229, 230), and a Motion to Suppress Evidence (ECF Nos. 231, 236).  The government has filed responses in opposition to each of Temple's suppression motions.  (ECF Nos. 262, 263, 264)

The undersigned held multiple hearings on Temple's suppression motions.  The undersigned also granted the parties' request to file post-hearing memoranda.  Those memoranda have now been filed.  (ECF Nos. 299, 336, 337, 338)

Having heard and fully considered the testimony and evidence presented, and in full consideration of the parties' arguments and the relevant case law, and for the reasons stated below, the undersigned recommends that the Court deny Temple's Motion to Suppress Statements, Motion to Suppress Identification, and Motion to Suppress Evidence.

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge, under 28 U.S.C. § 636(b).

## RELEVANT PROCEDURAL BACKGROUND

Additional background information may be found in an earlier Report and Recommendation addressing Temple's Motion to Dismiss certain counts.  (ECF No. 327)  For context, a brief summary of the charges is provided.  On May 12, 2015, the United States charged Temple by criminal complaint with one count of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1).  (ECF No. 1)  On May 13, 2015, the Grand Jury returned a one-count indictment, again charging Temple with one count of possession with intent to distribute heroin, in violation of 21 U.S.C. § 841.  (ECF No. 5)  On July 15, 2016, the Grand Jury returned a multi-count superseding indictment.  The superseding indictment added several, serious charges, as well as two co-defendants—Demante Syms and Samuel Spires.[2]  (ECF No. 30)

Count One of the superseding indictment charges Temple, Syms, and Spires with conspiracy to distribute heroin, in violation of 21 U.S.C §§ 846 and 841.  Count Two charges Temple, Syms, and Spires with conspiracy to possess one or more firearms, including a Colt .45 caliber semi-automatic pistol, in furtherance of the heroin conspiracy charged in Count One. Count Three alleges that, on or about March 27, 2015, Temple "did knowingly possess, brandish and discharge one or more firearms" in furtherance of the conspiracy charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A), and in the course of the violation, Temple caused the death of James Lacey.  Count Four alleges that, on or about March 27, 2015, Temple "did knowingly possess, brandish and discharge one or more firearms" in furtherance of the conspiracy charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A), and in the course of the violation, Temple caused the death of Paige Schaefer.  Count Five alleges that, on or about

---

[2] Syms and Spires have since pleaded guilty and are awaiting sentencing.  (See, e.g., ECF Nos. 153, 217)

March 27, 2015, Temple, Syms, and Spires, acting together, "did knowingly possess, brandish and discharge one or more firearms" in furtherance of the conspiracy charged in Count One, in violation of 18 U.S.C. § 924(c)(1)(A), and in the course of the violation, the defendants caused the death of Tammie Thurmond.  Count Six alleges that, on or about April 24, 2015, Temple knowingly and intentionally possessed, with the intent to distribute, heroin, in violation of 21 U.S.C. § 841.[3]

On March 21-22, 2017, and April 6, 2017, the undersigned held hearings on Temple's suppression motions.  Temple was present with his attorney, Daniel Juengel, and the government was represented by Assistant United States Attorneys Thomas Rea and Lisa Yemm.  On March 21, the government presented the testimony of three witnesses, each being Detectives with the St. Louis Metropolitan Police Department ("SLMPD").  Broadly speaking, Det. Marc Wasem testified regarding events associated with locating and arresting Temple on April 24, 2015.  This testimony covered a search incident to Temple's arrest and statements Temple made to Det. Wasem after the arrest.  Det. Wasem also testified concerning the circumstances of a search of 5036 Newport Avenue, St. Louis, MO.  Detective James Hyatt testified regarding locating, seizing, and searching a blue Buick sedan that had allegedly been used in connection with the March 2015 homicides then under investigation.  Detective Daniel Sweeney was the lead detective of the investigation into the March 2015 homicides and the related shooting of Brittney Brown.  Det. Sweeney testified regarding the circumstances associated with Ms. Brown's identification of Temple.  Det. Sweeney also testified regarding his interview of Temple on the evening of April 24, 2015, after Temple's arrest by Det. Wasem.

---

[3] The undersigned previously designated this to be a complex case within the parameters of the Speedy Trial Act.  (ECF No. 60)  Counts Three, Four, and Five allege crimes that carry a potential death penalty.  On November 8, 2016, the Government filed a notice indicating that it would not seek the death penalty against Temple.  (ECF No. 192)

On March 22, 2017, Temple presented testimony from Myesha Strickland regarding the circumstances surrounding the search of a residence at 5036 Newport Avenue, on April 24, 2015. Prior to the hearing, the government advised the Court that Ms. Strickland had previously testified in the Grand Jury, and that she also faced potential criminal exposure relative to the Temple investigation. Accordingly, the undersigned appointed Eric Butts as Ms. Strickland's stand-by counsel, should she desire such representation. Prior to the March 22nd hearing, Ms. Strickland was given the opportunity to meet privately with Mr. Butts. At the outset of the hearing, the undersigned confirmed that Ms. Strickland welcomed Mr. Butts' representation. Further, inasmuch as Ms. Strickland had already testified before the Grand Jury, the lawyers agreed that she had waived at least some of her privilege against self-incrimination. Thus, with Mr. Butts present to protect her rights, Ms. Strickland voluntarily appeared and answered questions under oath.

Based on the testimony and evidence from the March 21st and March 22nd hearings, the undersigned permitted Temple to explore some of the facts and circumstances associated with the use of Cell Site Simulators to assist in locating and arresting Temple on April 24, 2015. On April 6, 2017, the government voluntarily produced Special Agent Jason Davis, United States Secret Service, so that Temple could call S/A Davis to testify. S/A Davis testified regarding the circumstances associated with his use of Cell Site Simulator technology on April 24, 2015, to locate and attempt to locate a cell phone believed to be associated with Temple.

On June 14, 2017, in connection with a Motion to Compel Discovery filed by Temple (see ECF Nos. 301, 302, 305, 306, 317), the undersigned held a status conference with the attorneys at which time the government asked to re-open the evidentiary hearing, which Temple did not oppose. (ECF No. 314, 315) On July 13, 2017, the evidentiary hearing was re-opened.

4

Temple called co-defendant Spires[4] as a witness and questioned him regarding the timing and circumstances of the police attempt to gain entry into 5036 Newport Avenue, and whether Spires advised any police officer that Myesha Strickland and her infant son remained inside.  The government presented the testimony of Det. Nijauh Woodard and Det. Wasem.  Det. Woodard testified regarding the arrest of Spires and his recollection of what Spires told him about the presence of Myesha Strickland and her son.  Det. Wasem testified and corrected aspects of his prior testimony concerning his knowledge of whether he had been advised that someone remained in the Newport home after Spires's arrest by Det. Woodard.[5]

Temple's attorney extensively cross-examined the government's witnesses, and AUSA Rea extensively cross-examined Temple's witnesses.  In connection with the pending motions, the undersigned has received and considered several exhibits.  The government's exhibits are summarized in a table filed in ECF No. 296.

Based on the testimony and evidence adduced at the evidentiary hearing, having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, and having fully considered the parties' written submissions, the undersigned makes the following findings of fact, conclusions of law, and recommendations.

**FINDINGS OF FACT**

I.     **March 27, 2015 Homicides and Identification of Temple**

The Superseding Indictment in this matter alleges that, on March 27, 2015, Temple shot and killed James Lacey, Paige Schaefer, and Tammie Thurmond.  The government further

---

[4] Spires's attorney filed a brief summary of Spires's anticipated testimony in connection with Temple's Motion to Compel Discovery.  (ECF No. 309)  Spires, who has pleaded guilty and is awaiting sentencing, appeared with counsel at the re-opened evidentiary hearing pursuant to a Writ of Habeas Corpus Ad Testificandum.

[5] Det. Wasem's testimony in this regard is discussed in detail below.

contends that Temple shot, but did not kill, Brittney Brown.  Tammie Thurmond was Paige Schaefer's mother.  James Lacey, Paige Schaefer, and Brittney Brown were shot at 4467 Itaska, in the City of St. Louis.  Tammie Thurmond was shot at 4232 S. 37th St., in the City of St. Louis. The government alleges that Temple shot these individuals in connection with drug trafficking activity and all were shot with the same handgun.

Brittney Brown was shot in the head but survived.  After being shot, Ms. Brown managed to call 911 and request an ambulance.  (Gov't Exh. 6)  In her 911 call, Ms. Brown stated, "he just shot all of us in the head."  During the 911 call, Ms. Brown did not identify Temple by name, but described the shooter as a black male wearing a gray sweatshirt.  Shortly after the 911 dispatcher asked if the caller knew the shooter's name, Ms. Brown groaned.

A still photograph from surveillance at a Burlington Coat Factory store, from March 27, 2015, shows Temple wearing a gray sweatshirt.  (Gov't Exh. 7)

SLMPD Det. Daniel Sweeney was the lead detective in the homicide investigation.  At the time of the evidentiary hearing, Det. Sweeney had approximately twenty years of law enforcement experience, with approximately eight years as a detective.  Det. Sweeney testified that he had conducted numerous photographic arrays and suspect interviews.

Ms. Brown's cell phone was recovered by police.  On April 2, 2015, Det. Sweeney applied for a warrant relative to certain phone numbers located in Ms. Brown's cell phone, which included the number (314) 203-9177, listed with the name "KJ."  (Gov't Exh. 1A)  Det. Sweeney's warrant affidavit indicates that, earlier in the investigation, the Intelligence Division retrieved a partial set of historical records regarding Tammie Thurmond's phone.  The records included incoming, outgoing, and missed calls during the hours leading up to Ms. Thurmond's murder.  According to the affidavit, the records for Ms. Thurmond's phone showed activity

involving (314) 203-9177, which was the same number listed for "KJ" in Ms. Brown's cell phone.

Det. Sweeney first tried to interview Ms. Brown in the hospital, about ten days after the shooting, but was unable to do so due to Ms. Brown's condition. By mid-April 2015, Ms. Brown had been moved to a rehabilitation facility. On April 15, 2015, Det. Sweeney met with Ms. Brown at the rehabilitation facility. Prior to that meeting, Det. Sweeney prepared a photographic lineup to show to Ms. Brown. Det. Sweeney prepared the lineup using an automated system to select images to include with Temple's image. The lineup included a photograph of Temple and five other individuals having similar characteristics. (Gov't Exh. 9A) Each photo in the lineup was of an African American male with short hair. Each photograph was of the same size and orientation, showing each individual from the shoulders up, and each having substantially the same background. Five of the six individuals, including Temple, were wearing light-colored t-shirts, and one individual wore a dark shirt. There were no special markings or other indications on any of the photographs that would suggest one photograph was more important than any other photograph.

Det. Sweeney videotaped his meeting with Ms. Brown. (Gov't Exh. 8) The videotape shows that, prior to conducting the photographic lineup, Det. Sweeney interviewed Ms. Brown. Ms. Brown did not refer to Temple by his true name, but rather as "K.J." Ms. Brown provided a physical description of K.J. Ms. Brown stated that she had known K.J. for more than a year, and that K.J. had been her drug dealer. Ms. Brown also was able to identify K.J.'s phone number. Ms. Brown described the events surrounding the murders of James Lacy and Paige Schaefer. Ms. Brown stated that K.J. wanted money and pistol whipped Mr. Lacy. Brown gave some money to K.J., but K.J. was still upset.

7

Det. Sweeney presented the photo lineup in a sequential fashion, using six full-size photographs. Det. Sweeney advised Ms. Brown that it was o.k. if she did not know anyone in the photographs. Temple was the first photograph shown to Ms. Brown and she indicated that the person in the photograph was K.J., and initialed the back of the Temple photograph. (Gov't Exh. 9B) Ms. Brown also signed an acknowledgment form representing that she identified the person in photograph number 1 as the person she recognized from a "triple homicide," and that she was certain that she made a correct identification of the suspect. (Exh. 9C)

## II.    Locating and Arresting Temple on April 24, 2015

SLMPD Detective Marc Wasem has been in law enforcement for approximately fourteen years. For about the last seven years, Det. Wasem has also been a Task Force Officer with the FBI fugitive apprehension team. In April 2015, Det. Sweeney requested Det. Wasem's assistance in locating and arresting Temple. Det. Sweeney provided Det. Wasem with a general area in which to look, which included the Bevo Mill area near Newport and Delor, in the City of St. Louis.

On April 22, 2015, Det. Wasem conducted a criminal history check of Temple. Det. Wasem confirmed that there was a local, active felony arrest warrant for Temple for unlawful use of a weapon, resisting arrest, and property damage, among other warrants and wanteds for Temple. Det. Wasem relied on his criminal history check as a basis of probable cause to justify locating and arresting Temple. (Gov't Exhs. 11A & 11B)

Investigators also met with Daniel Schaefer, who is the brother of Paige Schaefer and the son of Tammie Thurmond, two of the homicide victims. Daniel Schaefer assisted the police in identifying possible locations where they might find Temple. While riding with police, Daniel Schaefer directed officers to two locations, an area near Newport and Delor, and an area near the old St. John the Baptist High School; both locations are in the Bevo Mill area of St. Louis.

Daniel Schaefer also assisted the police in identifying a possible number for a cell phone being used by Temple.  Schaefer called the number and positively identified Temple's voice as the person who answered the call.

On April 23, 2015, in the City of St. Louis Circuit Court, Det. Wasem applied for a court order directed to the phone number (314) 665-8458 (sometimes referred to herein as the '8458 phone or Temple's phone), which was a number Daniel Schaefer identified as Temple's number. (Gov't Exh. 2A)  Det. Wasem's submitted the application in an effort to precisely locate the '8458 phone and, therefore, locate and arrest Temple.  The application referenced both the pen register statute and the Stored Communications Act and sought both historical and prospective information relative to locating the '8458 phone.  See 18 U.S.C. §§ 3122 and 2703.  The application requested permission to install and monitor a pen register and trap-and-trace device on the '8458 phone, and requested that T-Mobile/TracFone be directed to provide various records and information regarding the phone to the SLMPD, the United States Secret Service, and other investigating agencies.  The application requested historical records for the thirty days prior to the application, and records going forward for ten days beyond the date of any Order. Particularly relevant to the motions pending before the Court is item number 9, which requested—

> Twenty-four hour a day assistance to include switch based solutions including precision location pursuant to probable cause based information queries and all reasonable assistance to permit the aforementioned Agencies to triangulate target location, including but not limited to terminating interfering service on the target telephone.

(Gov't Exh. 2A at page 2 of 10, emphasis supplied)  Thus, the application notified the issuing court that the police sought precision location information relative to the '8458 phone, both directly from the cellular provider (T-Mobile/TracFone), as well as from the investigating

agencies' efforts to triangulate the phone's location, and that the process might interfere with the service on the target phone.

Det. Wasem provided a sworn statement of facts in support of the application that referenced, among other facts, that Temple was then using the '8458 phone, that Temple was wanted for an active felony warrant, and that Temple was a suspect in Det. Sweeney's homicide investigation. The statement of facts attributed additional information to a reliable confidential informant. The statement of facts also represented that it was critical for investigators to "monitor the movements of the (target cellular telephone) thereby assisting in locating and/or arresting the fugitive/wanted suspect in this case for the active felony warrants/wanted." (Gov't Exh. 2A at page 5 of 10, emphasis supplied) The application to locate the '8458 phone was sworn to and signed by Det. Wasem before an Associate Circuit Judge for the Circuit Court in the City of St. Louis. An Assistant Circuit Attorney also signed the application.

The Associate Circuit Judge signed an order, dated April 23, 2015, that paralleled Det. Wasem's application. In the April 23rd Court Order, the Judge found probable cause to believe that the allegations were true and there was probable cause for issuance of an order pursuant to 18 U.S.C. §§ 2703, 3122, 3123, and 3124. The April 23rd Court Order required T-Mobile / TracFone to provide the requested information regarding the '8458 phone to the SLMPD and USSS. Like the application, the Order included a list of nine items. Item 9 required—

> Twenty-four hour a day assistance to include switch based solutions including precision location pursuant to probable cause based information queries and all reasonable assistance to permit the aforementioned agencies to triangulate target location, including but not limited to terminating interfering service on the target telephone.

(Gov't Exh. 2A at page 9 of 10, emphasis supplied) Just above the Judge's signature line was an indication that "With this Court Order we would like to obtain the following information; **Precision Locate**." (Id. at page 10, bold in original) For purposes of this Report and

Recommendation, the undersigned will refer to the April 23, 2015 Court Order as the "April 23rd Court Order."

During the afternoon of April 24, 2015, Det. Wasem and several other officers were conducting surveillance in the general area of Bevo Mill where they hoped to locate and arrest Temple.  The surveillance started in the area of the 4600 block of Ray.  Det. Wasem explained why the surveillance started at that location; when Daniel Schaefer was assisting the SLMPD earlier in April, he and Det. Sweeney observed Temple in the 4600 block of Ray.  The 4600 block of Ray Avenue is approximately three or four blocks away from the 5000 block of Newport Ave.  (Gov't Exh. 3-B)  As explained below, the police eventually concluded that Temple had been in a home at 5036 Newport Ave. and conducted a warrantless search of that home after arresting Temple.

Also on April 24th, Det. Wasem and the investigative team began receiving location information from the cellular provider, pursuant to the April 23rd Court Order.[6]  Det. Wasem explained that, although the information indicated that the target phone was in the Bevo Mill area of St. Louis as anticipated, the degree of precision was relatively poor, with an accuracy of approximately 1,000 meters.  Such accuracy would not readily facilitate locating Temple.  Temple has not challenged the location information provided to the police by T-Mobile / TracFone and no detailed record has been made as to how that location information was determined.  The location information directly from T-Mobile/TracFone is not the same as information obtained by using a Cell Site Simulator.

---

[6] At the evidentiary hearing in this matter, Det. Wasem explained generally how the April 23rd Precision Locate Order was transmitted to T-Mobile/TracFone and that a particular police unit (TAG or Technical Assistance Group) was responsible for such matters.

The use of a Cell Site Simulator to attempt to locate and arrest Temple is central to several aspects of Temple's motions to suppress.  The undersigned will discuss Cell Site Simulators in more detail, including specific findings of fact, in the discussion and analysis below.  The undersigned has also reviewed and considered a recording of the police radio traffic associated with the surveillance and arrest of Temple on April 24, 2015.  (Gov't Exhs. 3, 3A; Def. Exh. B)

The testimony and radio traffic indicate that Det. Wasem requested assistance from a Cell Site Simulator due to the precision of the information from the cellular provider (1000 meter accuracy).  As detailed below, no Cell Site Simulator was used to precisely locate the '8458 phone until after visual surveillance located Temple in the area and indicated that his home base was most likely on Newport Avenue.

The undersigned finds, based on the testimony from Special Agent Jason Davis, U.S. Secret Service, the term Cell Site Simulator is apt because such devices mimic cell towers ("cell sites").  When used to locate a particular cellular device, a Cell Site Simulator must be in the vicinity of the device to be located.  When used in the vicinity of a suspect's phone, a Cell Site Simulator can cause the suspect's cell phone to register with the Cell Site Simulator rather than to a local cell tower.  As described by S/A Davis, Cell Site Simulators do not force a phone to connect with it; rather, Cell Site Simulators take advantage of the fact that cell phones are designed to prefer to connect with the best cell tower available.[7]  When a Cell Site Simulator is deployed sufficiently close to the cell phone in question, that phone will register with the Cell

---

[7] S/A Davis summarized the process as follows:  "The cell site simulator does not activate the cell phone to respond to us.… [O]ur cell site simulator, when we're driving by T-Mobile phones, is more appealing [than] the signal that's on the tower because we are closer to it.  So that signal jumps on its own off that tower onto our cell site simulator at that point."  (Tr. Day 3 at 27)  S/A Davis further explained that the Cell Site Simulator works by being closer to the target phone not because it has a stronger signal than a cell phone tower.

Site Simulator rather than a normal cell tower.  To facilitate this capability, the Cell Site

Simulator operator needs some knowledge of the general whereabouts of the device to

successfully locate the target phone.  S/A Davis explained how he relied on data from T-Mobile

to get started.  In this case, the police had already visually observed Temple in the area as well.

After the Cell Site Simulator locks on to the target cell phone, it can provide information

that assists in locating the suspect's cell phone.  By analyzing the signals from the suspect's

phone, the Cell Site Simulator determines a direction and provides a metric indicative of signal

strength and provides that information to the operator.  The operator and investigators then use

their judgment (and perhaps other information such as prior visual surveillance in this case) to

assess where the phone might be.  When a Cell Site Simulator is locked on to a target phone, that

phone is not able to place or receive calls because the Cell Site Simulator interrupts normal

service.  The Cell Site Simulators used in this case did not obtain and provide GPS-type data

(e.g., latitude / longitude coordinates) from any phone, and did not intercept the content of any

communications (e.g., voice calls or text messages).

Ultimately, two Cell Site Simulators were deployed to attempt to locate Temple's cell

phone (the '8458 phone)—one operated by the SLMPD and one operated by the U.S. Secret

Service.  The two Cell Site Simulators were operated separately out of different vehicles.

The radio traffic confirms that only the Cell Site Simulator deployed by the Secret

Service was able to successfully lock-on and provide information permitting law enforcement to

identify a likely location of the '8458 phone.

Before any Cell Site Simulator was deployed to locate the '8458 cell phone, Detective

Early, who was in a covert position, observed Temple and two other males walking on a public

street in the area.  Det. Wasem, who was in an unmarked vehicle, thereafter positively identified

Temple.  The police conducted visual surveillance of Temple as he was in the public.  Visual

surveillance was lost when Temple entered a residence.  The surveillance team believed that Temple had likely entered a residence on the East side of Newport Avenue between Walsh St. and Delor St., which is the 5000 block of Newport Avenue.  The residence at 5036 Newport is on the East side of Newport.  (Gov't Exh. 3B)  The radio traffic associated with the visual surveillance efforts includes statements from Det. Early.[8]  Det. Early referred to this area of Newport as "home base."  Det. Early explains later in the radio traffic that the suspects were observed more than half-way down the block on Newport, which coincides with 5036 and 5040 Newport Avenue.  The remainder of the radio traffic confirms that the visual surveillance led the surveillance team to focus on the area around 5036 and 5040 Newport Avenue.  The homes at 5036 and 5040 Newport Avenue are next door to each other.  (Gov't Exh. 3B)[9]

     After Det. Early identified the area of 5000 Newport Avenue as Temple's home base the Cell Site Simulators were directed specifically to the 5000 block of Newport Avenue.  The SLMPD Cell Site Simulator made the first attempt to locate the '8458 phone.  Although the SLMPD briefly locked on the phone, the radio traffic unequivocally indicates that the SLMPD was unsuccessful in actually triangulating and locating the '8458 phone, despite knowing that Temple was in the area.  At one point, the operator states that the signal is everywhere and hard to narrow down.[10]

---

[8] At the hearing, a clip from the radio traffic was played and Det. Wasem's testimony indicated that the voice as Det. Early's voice.  That same voice is heard at several points in the radio traffic.  (Gov't Exh. 3)

[9] Government Exhibits 14A and B are photographs of the front and back of the residence at 5036 Newport Avenue.

[10] The SLMPD operator's description is entirely consistent with S/A Davis's testimony regarding the operation of Cell Site Simulators.  The device does not provide GPS-like coordinates.  Rather, it provides an indication of signal strength and direction.

After the SLMPD Cell Site Simulator failed to locate Temple's phone, the Secret Service covert vehicle drove by the 5000 block of Newport Avenue. The Secret Service Cell Site Simulator locked on to the '8458 phone. The associated radio traffic indicates that the suspected location for the '8458 cell phone was 5036 or 5040 Newport Avenue, with the Cell Site Simulator operator eventually indicating that 5036 was the most likely address.

The testimony at the evidentiary hearing established that, when a Cell Site Simulator locks on to a phone, that phone is unable to place or receive calls.[11] In this case, S/A Davis testified that he "released" the lock after about one minute. Releasing reduces the risk that the person using the phone (presumed to be Temple in this case) might figure out the police were trying to locate his phone. There was no further use of a Cell Site Simulator to locate the '8046 cell phone. Rather, according to Det. Wasem, the surveillance plan was to wait and see if the suspects exited the house, and S/A Davis testified that after he released the lock, he did not activate the Cell Site Simulator again.

In fact, the police did not need to enter or attempt to arrest Temple at 5036 or 5040 Newport Avenue. Before any arrest attempt was made, Temple and two other persons emerged from a gangway in the area of 5036 Newport Avenue and again walked on the public streets. The police maintained visual surveillance of Temple and the others while they were in the public. The radio traffic indicates a decision to let Temple get farther away from the house before attempting any arrest. As a result, the police decided to arrest Temple when he was in the area of 5201 Steffens Avenue. Temple fled on foot. Det. Wasem pursued Temple and

---

[11] As noted above, the application and corresponding April 23rd Court Order indicated that the investigating agencies might terminate interfering service of the target cell phone in attempting to triangulate the location of that phone. (Gov't Exh. 2A)

eventually apprehended and arrested him in the area of 4049 Eichelberger Street.  (Gov't Exh. 3B)  According to Det. Wasem, Temple was arrested at approximately 3:45 p.m.

SLMPD Det. Scanlon was with Det. Wasem after Temple's arrest.  Det. Scanlon conducted a search of Temple incident to the arrest and recovered a clear bag with suspected heroin and a cell phone.  Det. Scanlon placed Temple in his vehicle and returned with Temple to the area of Newport Avenue.  Det. Wasem walked back to the Newport area, looking for any weapons that may have been discarded by Temple and found none.

Based on the radio traffic and testimony, including Det. Wasem's testimony, the record establishes that, before any Cell Site Simulator was used to locate the '8046 phone, the police were already conducting visual surveillance in the 5000 block of Newport Avenue and were focused on the East side of that street.  The police had observed Temple in the area without the assistance of a Cell Site Simulator.

The radio traffic also indicates when the surveillance team was relying on Cell Site Simulator technology to locate Temple's phone.[12]  The surveillance team maintained visual surveillance of the area throughout and relied on the Cell Site Simulator for a brief moment in time.  The radio traffic and evidence adduced at the evidentiary hearing established that the police did not use a Cell Site Simulator to determine Temple's location while he was in public— either before Temple entered 5036 Newport Avenue or after emerged back in public and was subsequently arrested.  The Cell Site Simulator confirmed what Det. Early observed, that Temple went into a house more than half-way down Newport Avenue.  Even then, the police were not sure whether the house in question was 5036 or 5040 Newport Avenue.

---

[12] Temple makes much of a "sonar" sound on some of the radio, suggesting that the police were using the Cell Site Simulator to track Temple's whereabouts.  Even assuming that the sonar sound was that of a Cell Site Simulator, the fact that such a device is on does not lead to a conclusion that the police were using the device to locate Temple's phone.  If that were the case, there is no doubt that the radio traffic would so indicate, yet it does not.

16

**III.**    **Search of 5036 Newport Avenue on April 24, 2015**

After he arrested Temple, Det. Wasem returned to Newport Avenue. At this point in time, only Temple was in custody. Another suspect, now known to be Demonte Syms, was observed looking around a corner in a gangway in the area of Newport Avenue. Syms fled but was arrested and returned to the Newport Avenue area. Det. Wasem participated in the pursuit of Syms.

Det. Wasem testified that he planned to conduct a "knock and talk."[13] As noted above, the police were not sure which residence was in issue—5036 or 5040 Newport Avenue. Before conducting any knock and talk, Det. Wasem spoke with neighbors who identified 5036 Newport Avenue as a problem property, which Det. Wasem interpreted to mean that there had been narcotics activity at that address. The radio traffic also indicates that, before he attempted any knock and talk, Det. Wasem believed the house would likely be empty.

When Det. Wasem first attempted the knock and talk at 5036 Newport, Sam Spires came to the door but he refused to open it. Spires told Det. Wasem that he did not live in the house and that the police would need a warrant before he would open the door. After several minutes, Spires voluntarily left the rear of the residence and was arrested. According to the hearing testimony, there were thirteen SLMPD officers at the scene—one supervisor and twelve detectives.[14] Two officers were in the rear of the 5036 Newport residence when Spires left.

---

[13] A knock and talk is a form of a consensual encounter which does not require probable cause or reasonable suspicion. See United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008).

[14] There was at least one U.S. Secret Service Agent, S/A Davis, in the area. The record indicates that any Secret Service agents present remained at a distance, in the Cell Site Simulator vehicle, and Det. Wasem testified that no Secret Service agents participated in the search of 5036 Newport.

As indicated above, the Court re-opened the evidentiary hearing to receive additional testimony as to whether Spires told the police that anyone remained in the house after he left through the rear.  In his testimony, Spires acknowledged that he was involved in drug distribution with Temple and Syms, and that drugs and items associated with drug distribution were located inside the Newport home when the police arrived on April 24, 2015.  Spires was outside when the police attempted to arrest Temple but he managed to get back inside the house. Spires testified that one of the police officers who came to the door claimed to have a search warrant but did not produce any such warrant.[15]  Spires refused to allow the police entry.

When the police first encountered Spires at the door of 5036 Newport, they did not know that a woman named Myesha Strickland and her two-year old son were inside the Newport residence with Spires.  Ms. Strickland is Demonte Syms's girlfriend and mother of his young child.  Ms. Strickland has known Temple since high school.  Both Spires and Ms. Strickland testified that, after Temple's arrest, Spires attempted to gather and dispose of drugs in the house. According to Spires, Myesha Strickland held a bag while he gathered materials.  The materials were flushed down a toilet.  Ms. Strickland testified that it was her belief that all of the drugs in the residence had been disposed of before Spires left the residence.  Ms. Strickland denied assisting Spires with disposing evidence.

---

[15] Spires never allowed the police inside the residence and the police never obtained a warrant.  The government's position is that Myesha Strickland consented to the search after Spires voluntarily left the residence and was arrested.  Ms. Strickland's testimony is arguably inconsistent with Spires because she did not testify that the police claimed to have a warrant. Det. Wasem testified that the police never claimed to have a warrant to search the Newport residence.  To the extent it is relevant to the issue of whether Ms. Strickland voluntarily consented to a search of the Newport residence, the undersigned credits Det. Wasem in this regard.  To the extent an officer other than Det. Wasem may have told Spires that the police had a search warrant, that misrepresentation was not made to Ms. Strickland and, therefore, was not a factor in whether or not she was coerced into allowing the police into the Newport home.

Spires voluntarily exited the Newport residence via the rear door only after he spoke with Det. Wasem at the front door, and after he flushed drugs down the toilet.  Det. Nijauh Woodard, who was behind the residence, immediately arrested Spires.  Spires testified that he informed Det. Woodard that Ms. Strickland and a child remained inside.  Det. Woodard testified that he then advised Det. Early that a woman was inside, but he was unsure whether he ever mentioned the child to Det. Early.

After Spires exited 5036 Newport, Det. Wasem knocked on the door of 5036 Newport again and Ms. Strickland eventually answered the door.  Det. Wasem's testimony regarding his knowledge of Ms. Strickland's presence at the house changed from the initial evidentiary hearing in this matter to the re-opened evidentiary hearing.  During the initial hearing, Det. Wasem testified that, after Spires left the Newport residence via the rear door, it was Det. Wasem's belief that the residence was most likely empty and that he did not know anyone else was inside. When the Court re-opened the evidentiary hearing on July 13, 2017, Det. Wasem was recalled and acknowledged that his prior testimony was not correct.

At the re-opened evidentiary hearing, Det. Wasem testified that, in May or June 2017 (after a month or more after the first evidentiary hearing), he realized that Det. Early had, in fact, advised him that a woman was inside 5036 Newport.  Det. Wasem persisted in his testimony that he had not been advised that a child was inside.  Det. Wasem corrected aspects of his prior testimony and represented to the Court that he had not intentionally provided incorrect information in his prior testimony.

The undersigned credits Det. Wasem's representations that he did not intentionally provide false testimony in this matter.  The undersigned observed Det. Wasem's demeanor as he testified and admitted that an important aspect of his prior testimony had been factually incorrect.  The undersigned gave defense counsel additional time to prepare and cross examine

19

Det. Wasem and permitted some additional leeway in asking questions as to whether Det. Wasem has a history of inaccurate testimony (he testified that he does not).

Additionally, Det. Wasem's original testimony was not as inaccurate or misleading as Temple argues.  The radio traffic includes an indication that, after the police arrested Temple and Syms but before any knock and talk, Det. Wasem thought the Newport house would most likely be empty.  In particular, Det. Wasem states, "I don't think there's anyone inside, but just in case."  (Gov't Exh. 3 at 41:40)  It is clear that Det. Wasem reviewed that radio traffic before his initial testimony in this matter because he testified about numerous events described in that recording, including his statement that he did not think anyone was inside the house.  Thus, there was a point in time before the knock and talk that Det. Wasem did, in fact, believe that the house was most likely empty.  The entire sequence of events includes the following:  (1) Det. Wasem's initial belief that the house was likely empty, (2) Spires's statement to Det. Woodard that Myesha Strickland and her son were inside, (3) Det. Woodard's report to Det. Early that Ms. Strickland was inside, and (4) Det. Early's relay of that information to Det. Wasem.  Based on this sequence of events, if Det. Wasem intended to mislead the Court with his initial testimony, it would have been much easier and simpler to stand by his prior testimony than to admit that his prior testimony was not entirely correct.  Stated differently, the situation at 5036 Newport was dynamic; the radio transmissions and testimony make clear that the police were looking for three males, and two males were in custody before the knock and talk.  After Spires left the rear of the residence, three male suspects were in custody.  If Det. Wasem wanted to affirmatively mislead this Court, he could have simply stated that he did not recall Det. Early relaying any information to him regarding a person still inside.  Instead, Det. Wasem notified the government that his prior testimony was incorrect and took steps to correct it.  While the Court expects law enforcement officers to take great care in ensuring the accuracy of their testimony, the undersigned does not

believe that Det. Wasem intended to mislead the Court regarding his prior knowledge of Ms. Strickland's presence in the Newport residence and his mistake is understood when placed in context of the entire sequence of events, including the radio traffic.

Ms. Strickland testified that she lived at 5036 Newport Avenue with Syms and their infant son, as well as Tabitha Hunt (Syms's mother). She further testified that it was Ms. Hunt's house. Although Temple's booking sheet indicates that he lived elsewhere (Gov't Exh. 12A), Ms. Strickland testified that Temple stayed at the 5036 Newport Avenue residence. The evidence available to the undersigned indicates that Temple was likely an overnight guest at 5036 Newport Avenue on April 23-24, 2015.

Ms. Strickland testimony confirmed that, after Temple's arrest, Spires made it back to the Newport Avenue residence. Ms. Strickland acknowledged that she knew Spires was gathering and destroying drug evidence, but she denied participating in the destruction of any evidence. As noted above, Spires testified that Ms. Strickland assisted him by holding a bag while he gathered up drugs and drug-related items. To the extent it may be relevant to the determination of any issue in this matter, the undersigned credits Spires testimony that Ms. Strickland participated in the destruction of evidence. Spires's motive to falsify his testimony in this specific regard is diminished relative to that of Ms. Strickland—Spires has already been charged and pleaded guilty while Ms. Strickland has not.

Ms. Strickland also testified that, before the police apprehended Syms, Syms called to alert her and Spires about the police activity outside. Ms. Strickland testified that it was her belief that Spires left the house after all of the drugs were removed from the residence. Ms. Strickland acknowledged that she had no contact with the police on April 24, 2015, before Spires left the residence. Rather, her first interaction with the police on that day was when she opened the door to speak with Det. Wasem after Spires's arrest.

21

At no time did the police ask Temple or Syms for consent to search the 5036 Newport residence. Similarly, after Spires was arrested, the police did not ask him for consent to search the 5036 Newport residence.

Ms. Strickland answered the door and eventually allowed the police inside, consented to a search of the residence, and signed a written consent form. (Gov't Exh. 4) The consent to search form indicates that it was executed at 4:30 p.m., which was about 45 minutes after Temple's arrest. (Id.)

Det. Wasem and Ms. Strickland each testified regarding the circumstances regarding their interaction and her consent to search the 5036 Newport Avenue residence. Important aspects of their testimony conflict in material respects, particularly regarding the voluntariness of Ms. Strickland's consent. For example, Ms. Strickland testified that the only reason she opened the door and consented to a search was that the police threatened to report her to the Division of Family Services ("DFS").

Regarding the written consent to search form, Ms. Strickland testified that she was not given a chance to review and contemplate the consent to search form presented to her. She claimed it was put in front of her for just a second or two. Despite claiming she barely saw the form, Ms. Strickland admitted that she: (1) filled out her own name on the top of the form; (2) wrote the date on the bottom of the form; (3) signed the form; and (4) provided the detailed pedigree information on the second page of the form, which included her age and date of birth. (See Gov't Exh. 4) Ms. Strickland testified that she did not read the acknowledgement on the consent form above the date and her signature which stated as follows:

> I understand that I have the right to refuse consent to the search described above and to refuse to sign this form.
> I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

22

(Gov't Exh. 4)

Det. Wasem, on the other hand, testified that he did not threaten Ms. Strickland in any way, and that in his career he had never threatened to call DFS. Det. Wasem further testified that he did not know Myesha Strickland's minor child was inside until he was let in, and that Ms. Strickland voluntarily signed the consent to search form. According to Det. Wasem, Ms. Strickland was sitting when she was presented with the consent to search form and that their conversation was calm in nature. Det. Wasem explained that he confirmed that Ms. Strickland could read and asked her to review the consent form before signing it.

Det. Wasem testified that he thought that the men he was looking for that day might be armed. Det. Wasem also explained that, upon being allowed inside, officers conducted a brief protective sweep of the premises, looking only for other people in the house. The officers did not search for any evidence; rather they called out for anyone else in the house to make themselves known. Both Det. Wasem and Ms. Strickland testified that, throughout this process, the infant child remained asleep, thus corroborating Det. Wasem's testimony that he did not yell at Ms. Strickland.

Both Det. Wasem and Ms. Strickland also testified that Ms. Strickland was not physically detained, was never arrested, was permitted to call Tabitha Hunt (Syms's mother), and that Ms. Hunt came to the residence and was allowed to be present with Ms. Strickland. Ms. Hunt asked what the police were investigating, and the police explained the situation to her and showed her evidence. Ms. Hunt knew one of the officers on the scene. At no time did Ms. Strickland or Ms. Hunt object to the search or seek withdraw consent to search 5036 Newport Avenue. There is no evidence that either Ms. Strickland or Ms. Hunt complained about the manner of the search or how Ms. Strickland had been treated.

23

Ms. Strickland, although relatively young, was a 22 year-old adult who completed high school and can read and write and did not suffer from any sort of mental illness. Ms. Strickland did not appear to be under the influence of alcohol or any controlled substance, and did not appear to be in any physical or mental distress.

The undersigned credits the testimony of Det. Wasem where it materially conflicts with Ms. Strickland's testimony regarding any threats or coercion and the voluntariness of her consent. Ms. Strickland has a substantial bias. The undersigned observed Ms. Strickland's testimony. Her demeanor and testimony was sometimes evasive and she manifested a clear bias against the prosecutor. For example, Ms. Strickland has had nearly daily communications with Syms while has been detained in this matter. Ms. Strickland and Syms concocted a plan whereby they were trying to arrange for a meeting in the federal courthouse for sex so that Ms. Strickland could become pregnant with another child by Syms. Yet she testified that she does not love Syms. Further, in February 2017 (before the evidentiary hearing), both Syms and his mother, Tabitha Hunt, were charged with conspiring to have Ms. Strickland withhold her testimony in this matter. (See E.D. Mo. Case No. 4:17 CR 82 JAR) Ms. Strickland acknowledged that these charges resulted, in part, due to Syms's interactions with Ms. Strickland. Ms. Strickland further acknowledged that, at one point, she was involved in conversations regarding breaking the prosecutor's head.

The undersigned also does not credit Ms. Strickland's testimony that she was not given sufficient time to review the consent to search form (Gov't Exh. 4). Her own testimony is inconsistent. She claims it was placed in front of her to sign for only a few seconds, but she also testified that she printed her own name on the form, wrote the date on the form, provided the pedigree information that was placed on the back of the form, and she signed the form.

The undersigned will provide additional reasons for crediting Det. Wasem's testimony, and provide a more detailed analysis of the specific issues raised herein in the discussion of consent below.

The undersigned finds that Det. Wasem did not threaten to call DFS or have Ms. Strickland's minor child removed. To the extent Ms. Strickland feared she might be arrested, that fear was of her own making and was not the product of any inappropriate police conduct.

Despite Spires's effort to remove or destroy evidence, after entering the 5036 Newport Avenue residence, the police found and seized drugs, phones, and weapons, including an assault rifle that appeared to be of the style of an AR-15 (Gov't Exh. 16), which was recovered from the room shared by Ms. Strickland and Syms.

## IV.    Temple's Statements to Police on April 24, 2015

The police interviewed Temple twice on April 24, 2015. Det. Wasem conducted the first interview after Temple was arrested and transported back to the Newport Avenue area. Later during the evening of April 24, 2015, Det. Sweeney transported Temple from the St. Louis Justice Center to the SLMPD Headquarters building for an interview. Both the Justice Center and the SLMPD Headquarters are located in downtown St. Louis, Missouri. It is undisputed that Temple was in custody during both interviews.

Referring first to Det. Wasem's interview of Temple, after the police Temple returned to the 5000 block of Newport, he remained in a police vehicle. Det. Wasem testified that he read Temple his Miranda rights from a preprinted card.[16] According to Det. Wasem, Temple indicated that he understood his rights, waived those rights, and agreed to speak with the detective. Det. Wasem did not question Temple regarding the March 27, 2015 homicides. Det.

---

[16] Temple contends he was not given any Miranda warnings. This dispute is addressed in the discussion below.

25

Wasem testified that Temple appeared to be in his 20s, of normal intelligence and in good health, was not intoxicated or under the influence of drugs, and that no threats or promises were made to Temple.  Det. Wasem did not ask Temple for consent or permission to search 5036 Newport Avenue.  Det. Wasem did not record his interview of Temple.  Det. Sweeney did not participate in Det. Wasem's interview of Temple.

Temple was eventually taken to the St. Louis Justice Center by SLMPD Officers Metz and Flaugher.  According to Det. Wasem's report, at some point in the booking process, Temple was offered an opportunity to make a verbal or written statement, but he declined.  (Gov't Exh. 18)

Det. Sweeney testified that, during the evening of April 24, 2015, he and Detective Funk transported Temple from the St. Louis Justice Center to the Homicide Division within the SLMPD headquarters.  Det. Sweeney placed Temple in an interview room.  Det. Sweeney's interview was video recorded.  (Gov't Exh. 10)  Det. Wasem did not participate in Det. Sweeney's interview of Temple.

Det. Sweeney initially asked Temple some background questions, after which he provided the required Miranda warnings.  After receiving his Miranda warnings, Temple indicated that he understood his rights and agreed to speak with Det. Sweeney.  Det. Sweeney testified that Temple did not appear intoxicated or under the influence of any drugs, and did not appear to be suffering from any mental deficiency.  Det. Sweeney testified that he did not threaten or coerce Temple, and he did not he make any promises to Temple.  During the interview, Temple was permitted to ask questions.  After more than an hour, however, Temple indicated that he wanted to "plead the Fifth" and Det. Sweeney terminated the interview.  The video recording corroborates Det. Sweeney's testimony.

## V.    Seizure and Search of Blue Buick on May 13, 2015

Detective James Hyatt, SLMPD, testified at the evidentiary hearing regarding the seizure and subsequent search of a blue Buick LeSabre.  As explained below, the police believed the Buick had been used by Temple in connection with the homicides under investigation.  At the time of the hearing, Det. Hyatt had been in law enforcement for about fifteen years, and had been a homicide detective for about nine years.

On May 12, 2015, co-defendant Demante Syms met with and provided information to investigators.  Syms indicated that a blue Buick sedan had been driven during the commission of the murders of James Lace, Paige Schaefer, and Tammie Thurmond.  Syms provided a detailed description of the Buick, including color, window tinting, and license plate information.  Syms advised that the Buick had been in front of the Newport residence, but he had it moved to the area of Magnolia and Louisiana Streets, in South St. Louis, where it was abandoned.  Syms indicated that, in addition to Temple, Tammie Thurmond had previously been in the vehicle.  The police determined that the blue Buick was registered to a person named Oliver Cody.

On May 13, 2015, Det. Hyatt located a blue Buick that matched the description and information provided by Syms the day before.  The Buick was parked on a public street at 3227 Magnolia, near the area Syms had described.  Det. Hyatt testified that, based on what Syms told him and his observation of the Buick on the street, he believed that the Buick had been abandoned.  There was a weathered ticket on the windshield dated April 20, 2015, which indicated that the car had been ticketed while on Newport.  The car had debris and leaves on it giving the appearance of a vehicle that had been left where it was parked and not driven in a while.  (See Gov't Exhs. 5A1-5A9)  Det. Hyatt testified that the vehicle appeared to be operational and nothing indicated that it was not operational.  Det. Hyatt did not attempt to contact the registered owner of the vehicle

27

Based on the information provided to him by Syms and his observations of the vehicle, Det. Hyatt believed that the blue Buick had been used in the homicides and could have evidence inside, including possibly a murder weapon, shell casings, magazines, and similar equipment, as well as narcotic-related material.  Det. Hyatt also believed that there might be identification evidence such as fingerprints, DNA, or receipts.

After an evidence unit photographed the Buick where it had been located, Det. Hyatt had the Buick towed to a secure lot.  (Gov't Exh. B)    Det. Hyatt testified that he wanted to make sure that the vehicle was not moved or burned.  That same day, Special Agent Mark Wynn, ATF, applied for and obtained a federal warrant authorizing the search of the blue Buick.  (Gov't Exh. 5C; E.D. Mo. Cause No. 4:15 MJ 6128 TCM)  S/A Wynn's application specifically stated that the purpose of the warrant was to search for evidence of a crime, and that the Buick was property used in committing a crime.  United States Magistrate Judge Thomas C. Mummert, III (now retired) found probable cause and issued a warrant authorizing the search of the vehicle for:

> items providing identification of those present inside the vehicle at any given time; fingerprints; blood stains; hair; other items possessing DNA characteristics; any item possessing genetic forensic, or other material; firearms; firearms-related materials such as ammunition, shell casings, and/or magazines; controlled substances; controlled substances-related materials.

(Id.)

Myesha Strickland's testimony at the evidentiary hearing is consistent with Det. Hyatt's account.  For example, Ms. Strickland testified that Syms was concerned about parking the Buick in front of the 5036 Newport residence because the car had been used in the homicides.  Ms. Strickland also testified that Syms made arrangements to have the Buick towed away from the Newport residence.  Ms. Strickland further testified that she had not seen anyone drive the Buick after it was towed.

28

Additional findings of fact are included in the following discussion and conclusions of law.

## DISCUSSION, CONCLUSIONS OF LAW, AND RECOMMENDATIONS

Temple filed motions to suppress the following:  (1) Brittany Brown's identification of Temple; (2) his statements to law enforcement on April 24, 2015; (3) evidence seized pursuant to a State of Missouri Warrant, issued April 2, 2015, for account information associated with (314) 203-9177; (4) evidence seized in association with a State of Missouri Court Order, issued April 23, 2015, relating to locating a cellular phone having the number (314) 665-8458; (5) evidence seized from 5036 Newport Ave. on April 24, 2015; (6) evidence seized from Temple incident to his arrest on April 24, 2015; (7) evidence from the seizure and search of a 1998 blue Buick LeSabre; and (8) evidence associated with a January 19, 2015 traffic stop.  (See ECF Nos. 228, 229, 231)

Prior to the evidentiary hearing, Temple withdrew his motion to suppress evidence relative to the January 19, 2015, traffic stop.  Temple has agreed that his challenge to the April 2, 2015, Search Warrant is limited to the four-corners of the affidavit and warrant (Gov't Exh. 1A).  The Court received evidence and testimony regarding the remaining suppression issues.

## I.      Motion to Suppress Identification

### A.      Summary of Parties' Arguments

In his Motion to Suppress Identification Testimony (ECF Nos. 229, 230), Temple asks the Court to suppress any identification evidence or testimony from Brittany Brown.  As noted above, on April 15, 2015, Brown identified Temple from a sequential photo array prepared by Det. Sweeney.  Temple argues that the sequential photo display and identification procedures Det. Sweeney used with Ms. Brown were tainted and improper in at least two ways.  First, Temple contends that the photo array itself was unnecessarily suggestive and presented in a

manner likely to result in a misidentification.  Second, Temple contends that Ms. Brown's ability to independently identify Temple was contaminated because she was given detailed information about the suspect (Temple) and investigation.  In particular, Temple suggests that Brown's identification of Temple was influenced by Daniel Schaefer, a relative of one the murder victims. Daniel Schaefer was interviewed by a local television news reporter regarding the murders, and Brown watched that interview.

The government contends that the lineup and associated procedures were not impermissibly suggestive or constitutionally deficient.

### B.    Analysis

A defendant's constitutional right to due process may be violated by pretrial confrontation procedures that are unnecessarily suggestive and conducive to an irreparably mistaken identification.  Foster v. California, 394 U.S. 440, 442 (1969); Stovall v. Denno, 388 U.S. 293, 302 (1967).  "It is the likelihood of misidentification which violates a defendant's right to due process[,]" and suggestive confrontations are disapproved because they increase that likelihood.  Neil v. Biggers, 409 U.S. 188, 198 (1972).  In determining whether an identification is reliable, courts look to such factors as the witness's level of certainty demonstrated at the confrontation, and the length of time between the crime and the confrontation.  Neil, 409 U.S. at 199; Manson v. Brathwaite, 432 U.S. 98, 114 (1977).  The identification testimony may be admitted if the reliability of the identification outweighs the corrupting effect of any undue suggestion.  Id.

The Court's consideration of the admissibility of identification testimony involves a two-part test.  See United States v. Mshihiri, 816 F.3d 997, 1008-09 (8th Cir.) (citing United States v. Williams, 340 F.3d 563, 567 (8th Cir. 2003)), cert. denied, 137 S. Ct. 319 (2016).  First, the Court must determine whether the identification procedures used were impermissibly suggestive.

Second, if the procedures used were impermissibly suggestive, the Court looks to the totality of the circumstances to determine whether the procedures were nonetheless reliable or created a "substantial likelihood of irreparable misidentification." Id. (internal quotations and citations omitted). "In determining the likelihood of misidentification, [the Court] consider[s] 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.'" Id. (quoting Williams, 340 F.3d at 567) (internal quotations omitted). See also United States v. House, 823 F.3d 482 (8th Cir. 2016) (applying two-part test to photographic line-up); United States v. Omar, 786 F.3d 1104 (8th Cir. 2015) (applying two-part test to use of sequential use of photographs). If a court concludes that a witness's an out-of-court identification was constitutionally sound, there is no need to further consider the argument of whether that witness's in-court identification should be suppressed as fruit of the poisonous tree. See House, 823 F.3d at 488 (quoting United States v. Hadley, 671 F.2d 1112, 1116 (8th Cir. 1982)).

A witness's prior relationship with the suspect, however, is an important consideration in the analysis. The Eighth Circuit has explained that concerns regarding undue suggestiveness are absent when the identifying witness is already familiar with the suspect's appearance. See Omar, 786 F.3d at 1109-10 (citing United States v. Dobbs, 449 F.3d 904, 909-10 (8th Cir. 2006) (distinguishing identifications of strangers during a short encounter), cert. denied, 549 U.S. (2007)).

Applying the foregoing legal principles to the facts established at the evidentiary hearing, the undersigned concludes that the identification procedures used by Det. Sweeney were not impermissibly suggestive.

Det. Sweeney created a photo array consisting of six individual photographs using a computer program which selected five individuals having characteristics similar to Temple. (Gov't Exh. 9A)[17] Nothing in those photographs would suggest that any particular photograph was more important or noteworthy than any other—the sizes of the images were similar, the backgrounds were the same, and the individuals were similarly dressed and groomed (although one individual had a darker shirt than the others). There is no legal problem with the fact that Det. Sweeney presented the images sequentially, rather than in a six-person array on a single sheet. See Omar, 786 F.3d 1108. Moreover, Det. Sweeney documented his interview of Brown, including his presentation of the photographs to her, with a video recording. (Gov't Exh. 8) Det. Sweeney showed her each of the photographs; there is no indication in that video that Det. Sweeney suggested to Brown which photograph she should focus upon. Rather, Det. Sweeney advised Brown that it was acceptable if she did not identify anyone.

Brown identified Temple (Gov't Exhs. 8, 9B) and executed a photographic lineup acknowledgement form representing as follows:

> No law enforcement officer or any other person present at the time I viewed the photographs informed me if the suspect was or was not in the array, nor did anyone suggest to me at any time, in any way, that I should select any particular individual.
> I made this judgment of my own free will and do so without any threats or promises given to me.

(Gov't Exh. 9C) The undersigned concludes that the photographic identification procedures employed were not impermissibly suggestive.

Furthermore, in this case, concerns for misidentification are absent because the video recording and other evidence demonstrate that Brown had an established relationship with Temple before the shooting. Ms. Brown knew Temple by the name K.J., she described his

---

[17] To be clear, Gov't Exh 9A shows a six-person photo array for convenience, but Brown was shown each photograph sequentially, on individual full-size sheets of paper.

appearance, and she represented that she had known him for about a year and that he was her drug dealer.  Ms. Brown had a phone number in her cell phone which was identified as belonging to K.J.  (Gov't Exh. 1A)  Even though Brown did not identify Temple by name when she called 911 after being shot, she stated that the shooter was wearing a gray sweatshirt.  (Gov't Exh. 6)  Brown's description of the shooter matched a security camera image of Temple taken at a local store on the day of the shooting.  (Gov't Exh. 7)  Cf. Omar, 786 F.3d at 1108 (noting that, in assessing the constitutionality of an identification technique, courts consider, among other things, the accuracy of the witness's prior description).

Although Brown watched Daniel Schaefer's interview on the news, Daniel Schaefer never identified Temple by name or nickname.  There is no reason to conclude that Brown's identification of Temple resulted from anything other than her own recollection.  The undersigned finds that Brown knew and was familiar with Temple and his appearance before the shooting.  Thus, the fact that her identification occurred about a month after the murders and shootings is of no moment in this case.  Concerns regarding undue suggestiveness or a risk of misidentification are absent in this case.  See id. at 1109-10.[18]

Finally, in a supplemental pleading (see ECF No. 300), Temple argues that the Court violated his due process rights and he should have been permitted to present additional evidence and testimony that Ms. Brown's identification was tainted by contact with Daniel Schaefer and Zach Schaefer.  As a factual matter, a full consideration of the existing record, including the video of Ms. Brown's interview refutes Temple's argument.  As a legal matter, Ms. Brown knew and was aware of Temple well before she identified him and she generally described Temple in the 911 call after she was shot.  See Omar, 786 F.3d at 1109-10.  Thus, accepting as true the

---

[18] The government aptly notes that Brown's head injury and past drug use are not relevant on the issue of whether the identification procedures were impermissibly suggestive or otherwise unconstitutional.  (See ECF No. 264 at n.2 (citations omitted))

proffered basis for the testimony of Daniel and Zach Schaefer, such information would not meaningfully alter the analysis of the identification issue raised herein.

Temple's due process rights have been scrupulously honored throughout these proceedings. When he has made a reasonable showing of relevance to issues actually before the Court, rather than mere speculation based on theories lacking relevant legal support, he has been permitted to call additional witnesses and present additional testimony.

For the foregoing reasons, Temple's Motion to Suppress Identification Testimony should be denied.

## II.    **Motion to Suppress Statements**

### A.    **Summary of Parties' Arguments**

After his arrest on April 24, 2015, Temple was questioned two different times by two different police officers. Temple first made statements to Det. Wasem shortly after the foot chase and arrest described above. Temple was then transported to the St. Louis Justice Center for booking by different officers who did not question Temple. A police report reflects that Temple declined an offer to make a statement in connection with his booking. After booking, during the evening of April 24th, Det. Sweeney transported Temple from the Justice Center to the homicide division at the St. Louis Police Headquarters and conducted another interview.

In his Motion to Suppress Statements (ECF No. 228), Temple asks the Court to suppress all statements he made to law enforcement after he was arrested on April 24, 2015, arguing that any statements he made to the police on April 24, 2015, were obtained in violation of his constitutional rights.

Regarding the statements he made to Det. Wasem, Temple argues that those statements must be suppressed because he was not read his Miranda rights prior to be questioned by Det. Wasem. Regarding his statements to Det. Sweeney, Temple contends that by declining to make

a statement during booking, he exercised his right to remain silent and to counsel, and he did not thereafter initiate any contact with investigators to indicate that he wished waive his rights. Thus, according to Temple, any statements he made to Det. Sweeney must be suppressed.

Temple offers additional arguments regarding his statements to Det. Sweeney. Temple contends that any waiver and statements he made to Det. Sweeney resulted from police coercion. Temple suggests that the length and nature of his custody on April 24th was inherently coercive, and he was tricked by promises of leniency into making statements. Temple also argues that his statements to Det. Sweeney must be suppressed because the police failed to present him to a Magistrate Judge "as soon as practicable."

Temple also argues that any statements he gave should be suppressed as fruit of the poisonous tree because (1) he was arrested without lawful authority (e.g., there was no probable cause to arrest him), and (2) his arrest was the product of an illegal search, namely the use of a Cell Site Simulator to locate his cell phone.

Broadly speaking, the government contends that Temple was given timely Miranda warnings, and that Temple waived his rights and made voluntary statements to the investigators. More specifically, the government contends that Temple's arrest was made pursuant to an active felony warrant, and Det. Wasem advised Temple of his rights shortly thereafter. The government further argues that Temple also waived his rights and gave voluntary statements to Det. Sweeney later on the evening of April 24, 2015.

### B.    Legal Principles and Framework

Generally, statements to law enforcement officers made during custodial interrogation are subject to the protections and procedures identified in Miranda v. Arizona, 384 U.S. 436, 477-78 (1966). See United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc), cert. denied, 543 U.S. 1145 (2005). "Not every confession obtained absent the Miranda warnings is

inadmissible, however, because 'police officers are not required to administer <u>Miranda</u> warnings to everyone whom they question.'"  <u>Id.</u> (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)).  Rather, <u>Miranda</u> warnings are required only when a suspect is both in custody <u>and</u> subjected to interrogation.  <u>See id.</u>  When applicable, such warnings must be given before questioning begins.  <u>See Miranda</u>, 384 U.S. at 444.

Because <u>Miranda</u> applies only to custodial interrogation, voluntary statements which are not in response to questioning are not subject to <u>Miranda</u>.  <u>See Rhode Island v. Innis</u>, 446 U.S. 291, 300-01 (1980).  "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody …."  <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990) (citation and quotation omitted).  Routine booking questions are reasonably related to police record-keeping and, therefore, are not related to the cautions of <u>Miranda</u>.  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 600-02 (1990); <u>United States v. Reyes</u>, 908 F.2d 281, 287-88 (8th Cir. 1990).

If, after being given <u>Miranda</u> warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 169-70, 174 (1986); <u>North Carolina v. Butler</u>, 441 U.S. 369, 373-76 (1979); <u>Miranda</u>, 384 U.S. at 444, 475.  There is no requirement, however, that investigators advise a suspect of the specific subject matter of the interrogation. <u>See United States v. Syslo</u>, 303 F.3d 860, 865-66 (8th Cir. 2002) (citing <u>Colorado v. Spring</u>, 479 U.S. 564, 576 (1987)).

"Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but [the suspect] may not be approached for further interrogation 'until counsel has been made available to [the suspect].'"  <u>McNeil v. United States</u>, 501 U.S. 171, 176-77 (1991) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981)).  "The <u>Edwards</u> rule… is *not* offense

specific:  Once a suspect invokes the <u>Miranda</u> right to counsel for interrogation regarding one offense, [the suspect] may not be reapproached regarding *any* offense unless counsel is present." <u>Id.</u> at 177 (citing <u>Arizona v. Roberson</u>, 486 U.S. 675 (1988)).

The courts have consistently held, however, that a suspect's equivocal or ambiguous invocation of his or her <u>Miranda</u> rights is not sufficient.  See <u>United States v. Havlik</u>, 710 F.3d 818, 821 (8th Cir. 2013) (citing <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994) (explaining that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be involving the right to counsel, our precedents do not require the cessation of questioning")).  Moreover, investigators are not required to "ask clarifying questions when a suspect makes an ambiguous statement regarding counsel." <u>Id.</u> at 821.

The Supreme Court has also explained that "[d]uring an interrogation, '[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.'" <u>United States v. Adams</u>, 820 F.3d 317, 322-23 (8th Cir. 2016) (quoting <u>Miranda</u>, 384 U.S. at 473-74).  Like the invocation of the right to counsel, a suspect's invocation of his right to silence must be unequivocal and unambiguous.  See <u>Berghuis v. Thompkins</u>, 560 U.S. 370 (2010) (invocation of right to remain silent).  The Eighth Circuit has explained that "[t]o adequately invoke this right and effectively cut off questioning, a suspect must indicate a clear, <u>consistent</u> expression of a desire to remain silent." <u>Adams</u>, 820 F.3d at 323 (emphasis supplied) (citation and internal quotations omitted).  A reviewing court is to "consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." <u>Id.</u>  Finally, while a suspect's invocation of his <u>Miranda</u> rights must be scrupulously honored, the strict nature of the <u>Edwards</u> rule regarding the invocation of a right to counsel, which is not offense specific, does not apply strictly to an

37

invocation of the right to remain silent.  See Michigan v. Mosley, 423 U.S. 96, 102-04 (1975). Instead, under certain circumstances, law enforcement can re-approach and interview a suspect who has asserted his right to silence.  Id.

The government has the burden of proving by a preponderance of the evidence that a suspect voluntarily and knowingly waived his Miranda rights, and that the resulting statements were voluntary.  See Connelly, 479 U.S. at 168 (1986); LeBrun, 363 F.3d at 724.

### C.    Temple's Statements to Det. Wasem

Temple was in custody when Det. Wasem questioned him.  Det. Wasem testified that he read the required Miranda warnings to Temple before questioning him, and Temple contends that he was not read his rights.  In support, Temple notes that he later told Det. Sweeney that he was not read his rights earlier in the day.  Having considered Det. Wasem's demeanor while testifying, as well as Temple's demeanor in the video recorded interview, the undersigned credits Det. Wasem's testimony that he provided Miranda warnings to Temple prior to questioning him. Additionally, during his interview with Det. Sweeney, Temple did not long persist in his claim that Det. Wasem failed to provide Miranda warnings and he freely answered Det. Sweeney's questions.

After providing warnings, Det. Wasem confirmed that Temple understood his rights and Temple agreed to answer questions.  Det. Wasem noted that Temple appeared to be in his 20s, of normal intelligence, and did not appear to be intoxicated or otherwise under the influence of drugs or alcohol.  Det. Wasem did not threaten or physically intimidate Temple, nor did he make any promises to him.  Det. Wasem testified that Temple appeared to understand what was going on and their interaction was cordial.  Det. Wasem did not question Temple regarding the March 27, 2015, homicides.

Based on the record before the Court, the undersigned finds that, prior to questioning Temple, Det. Wasem advised Temple of his <u>Miranda</u> rights. Temple acknowledged his rights and knowingly and voluntarily answered questions. There is no evidence or suggestion that Det. Wasem tricked, coerced, or threatened Temple in any way. The undersigned recommends that Temple's motion to suppress statements to Det. Wasem be denied.

**D.    <u>Temple's Statements to Det. Sweeney</u>**

Temple argues that he invoked his <u>Miranda</u> rights at the Justice Center when he declined an offer to make a statement, and that later questioning was in violation of his rights. Temple has raised several additional and related concerns which are separately considered below.

**1.    <u>Consequences of Declining to Make a Statement at Booking</u>**

After Det. Wasem questioned Temple, two other officers transported Temple to the St. Louis Justice Center for booking. The record indicates that these officers were not involved in questioning Temple. In connection with booking, Temple declined to provide a statement. At the hearing, Det. Wasem explained that it is customary procedure to give arrestees an opportunity to make a statement. If an arrestee indicates that he wishes to make a statement, he is provided <u>Miranda</u> warnings, if not the booking process is completed and he is placed in a cell.

Although he was certainly in custody, Temple was not subjected to any interrogation during booking. Temple argues that by declining a routine offer to make a statement, he invoked his right to remain silent and his right to counsel. The record and law do not support Temple. Declining to give a statement during routine booking procedures, without more, is not a clear invocation of the right to counsel, <u>see Havlik</u>, 710 F.3d at 821, and arguably does not amount to an unequivocal invocation of the right to remain silent, <u>see Adams</u>, 820 F.3d at 323.

"A suspect invokes his right to remain silent by making a clear, consistent expression of a desire to remain silent." <u>United States v. Ferrer-Montoya</u>, 483 F.3d 565, 569 (8th Cir. 2007)

39

(internal quotations and citation omitted); see also United States v. DeMarce, 564 F.3d 989, 994 (8th Cir. 2009) (quoting Ferrer-Montoya). In DeMarce, the defendant stated, "You know, I don't want to talk to you. I'm not going to sign nothing," and left the room. 564 F.3d at 994. The Eighth Circuit found that was a clear invocation of the right to remain silent.

Temple's situation is factually different than that encountered in DeMarce. Temple merely declined the opportunity provide a statement during routine booking procedures; this was not in response to any specific questioning. Further, it occurred after Temple had received Miranda warnings from Det. Wasem and provided statements. See United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995) (courts consider a "defendant's statements as a whole to determine whether they indicate an unequivocal" invocation of the right to remain silent) (citation omitted). Thus, the record does not support a conclusion that Temple unequivocally and unambiguously invoked his right to remain silent at booking.

Nonetheless, the undersigned will assume that, by declining to make a statement, Temple sufficiently invoked his right to remain silent. Giving Temple the benefit of the doubt does not end the inquiry. Rather, "[w]hen a suspect invokes the right [to remain silent], the police are not entirely prohibited from reinitiating questioning." United States v. Pugh, 25 F.3d 669, 673 (8th Cir. 1994) (citing Michigan v. Mosley, 423 U.S. 96 (1975)).[19]

In Michigan v. Mosley, 423 U.S. 96 (1975), the Supreme Court explained that, even though questioning must cease upon a suspect's invocation of the right to remain silent, the cessation of questioning does not mean that investigators cannot ever question that suspect again.

---

[19] To be clear, the undersigned finds that Temple never invoked his right to counsel. In his arguments, however, Temple relies on cases involving the invocation of the right to counsel. "Unlike an unambiguous request for counsel, after which questioning must invariably cease until a lawyer is provided, an invocation of the right to remain silent does not automatically bar the resumption of questioning." United States v. Oquendo-Rivas, 750 F.3d 12, 17 (1st Cir. 2014) (citation omitted), petition for certiorari docketed, No. 16-8496 (Mar. 27, 2017). Inasmuch as Temple never invoked his right to counsel, cases focusing on that right are not particularly apt.

The Court considered circumstances in which law enforcement could resume questioning a suspect, despite a prior invocation of the right to remain silent.  See 423 U.S. at 102-04.

The facts of Mosely are instructive to Temple's case.  In Mosley, a police officer attempted to question a suspect regarding certain robberies.  The suspect stated he did not want to discuss the robberies and questioning ceased.  Id. at 104.  "After an interval of more than two hours, [the suspect] was questioned by another police officer at another location about an unrelated holdup murder."  Id.  The suspect was given fresh, "full and complete Miranda warnings," and given an opportunity to exercise his options.  Id.  The Court held that "[t]he subsequent questioning did not undercut [the suspect's] previous decision not to answer [questions]."  Id. at 105.  The Court noted that the police did, in fact, cease questioning earlier, and the later questioning was not part of repeated or persistent efforts to wear down the suspect and make him change his mind.  Id.  The later questioning was by a different officer and focused on a different crime.  The Court found that an interval of more than two hours was a "significant period of time."  Id. at 106.

After Mosely, the Eighth Circuit has typically considered the following three factors when assessing whether a suspect's earlier invocation a right to remain silent has been scrupulously honored despite later questioning:

> 1) whether the initial interrogation ceased immediately upon the defendant's request;
> 2) whether a significant period had passed and fresh Miranda warnings were given before resuming questioning; and
> 3) whether the later interrogation is restricted to a crime that was not the subject of the first interrogation.

DeMarce, 564 F.3d at 994 (citing Hatley v. Lockhart, 990 F.2d 1070, 173-74 (8th Cir. 1993);

Michigan v. Mosley, 423 U.S. 96 (1975)).

Applying the factors outlined in <u>DeMarce</u> and the Supreme Court's analysis in <u>Mosley</u>, and further assuming that Temple unequivocally invoked his right to right to remain silent  by declining to make a statement at booking, the undersigned concludes that the police scrupulously honored Temple's invocation.

First, Temple was not interrogated during booking, and any prior interrogation ceased after Det. Wasem questioned Temple, which was before booking.  Second, the hearing testimony and exhibits demonstrate that Temple was booked in the afternoon of April 24, 2015.  Det. Sweeney did not question Temple until several hours later that evening and at a different location.  Thus, a significant period of time elapsed from the time Temple was questioned by Det. Wasem, to the time Temple was booked and declined to make a statement, to the time Det. Sweeney questioned Temple.  <u>See</u> <u>Mosley</u> 423 U.S. at 104, 105 (finding a two hour interval to be "a significant period of time").  The record further demonstrates that Det. Sweeney provided Temple with a full, fresh, and complete set of <u>Miranda</u> warnings prior to questioning Temple about the March homicides.  The record further indicates that Temple clearly understood his rights and he was given a full opportunity to exercise those rights.   Third, Temple was not questioned during booking at all and Det. Sweeney was not involved in the prior limited questioning of Temple by Det. Wasem.  Det. Wasem did not question Temple regarding the March 2015 homicides.  In contrast, Det. Sweeney's questioning focused on the March 2015 homicides.  The undersigned has carefully reviewed the entire video recording of Det. Sweeney's interview.  To the extent there was any discussion of Temple's prior warrant and arrest, or his possession of heroin, Temple brought up those topics.  Thus, Det. Sweeney's questioning involved a criminal matter distinct from the crime for which Temple was arrested and booked, and distinct from Det. Wasem's questioning.

In summary, to the extent Temple's refusal to make a statement during booking can be construed as a clear and unequivocal invocation of his right to remain silent, the police scrupulously honored that invocation.   Det. Sweeney's subsequent questioning was not part of any repeated or persistent efforts to wear down Temple.  Mosely, 423 U.S. at 105.

### 2. Questioning by Det. Sweeney Prior to Providing *Miranda* Warnings

Temple also contends that any statements he made in response to Det. Sweeney's initial questions should be suppressed because those questions were posed before the provision of any Miranda warnings.  At the hearing, the government suggested that such questions were in the nature of routine booking questions and need not be suppressed.  See Muniz, 496 U.S. at 600-02.

Temple is correct that Det. Sweeney asked some questions prior providing any Miranda warnings.  Upon entering the interrogation room, Det. Sweeney introduced himself, and asked Temple to provide the following information:  (1) his full name; (2) his date of birth; (3) where he stays; (4) his phone number; (5) his work phone number; (6) where he works; (7) his Social Security Number; and (8) whether he lives on Newport.  Temple answered each of these questions.  Although these questions occurred after formal booking, Det. Sweeney testified that such questions were part of his normal procedure to get basic pedigree and similar information from persons he questions.

Most of Det. Sweeney's questions fall squarely within the scope of routine booking questions and do not violate the Miranda standards.  See Muniz, 496 U.S. at 600-02.  Det. Sweeney's question regarding Temple's connection to the Newport address, however, presents a more significant issue, as it could surely be intended to elicit an incriminating response and was more specific than a routine or standard booking question.  Temple's statement in this regard need not be suppressed for two reasons.  First, Temple has consistently argued to this Court that he stayed at the Newport address and that he has standing to challenge any search of that home.

43

Second, later in the interrogation, and after being fully advised of his rights, Temple stated at least twice that he sometimes stays at the Newport residence.

Similarly, Det. Sweeney's question to Temple regarding his telephone numbers could arguably be characterized as intending to elicit an incriminating response because the phone Temple used in March 2015 was relevant to the homicide investigation.  Any foul in this regard is harmless.  After he was given his Miranda warnings, Temple discussed his cell phone history several times, albeit with some inability to recall specific information, including an inability to recall the number assigned to his cell phone earlier in the year.

Finally, there is no argument or suggestion supported by the record that Det. Sweeney employed an inappropriate two-step interrogation technique, in violation of Missouri v. Seibert, 542 U.S. 600 (2004).  After Seibert, the Eighth Circuit has made clear that the mere fact of a Miranda violation does not necessarily trigger suppression of later, fully warned statements. Rather, "[w]arned statements elicited after an initial Miranda violation may be admissible, so long as officers do not purposefully elicit an unwarned confession in an effort to circumvent Miranda requirements."  United States v. Morgan, 729 F.3d 1086, 1091-92 (8th Cir. 2013 (citations omitted).  Temple has not raised and argued a colorable Seibert claim and no such claim would appear to be supported on the record.

The undersigned recommends that Temple's responses to Det. Sweeney's initial questions not be suppressed.

### 3.   Post-*Miranda* Statements to Det. Sweeney

Although it may be implied by the analysis above, the record before the Court including the video recording of Det. Sweeney's interrogation also establishes that Det. Sweeney properly advised of Temple of his Miranda rights, and that Temple knowingly and voluntarily waived those rights and answered questions.

44

If, after being given <u>Miranda</u> warnings, a defendant agrees to make a statement, the government must show that the waiver was voluntary, knowing, and intelligent for the statement to be admissible at trial. <u>Connelly</u>, 479 U.S. at 169-70, 174; <u>Miranda</u>, 384 U.S. at 444, 475. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." <u>LeBrun</u>, 363 F.3d at 724. <u>See also</u> <u>Mshihiri</u>, 816 F.3d at 1004 (quoting <u>LeBrun</u>); <u>United States v. Perry</u>, 714 F.3d 570, 574 (8th Cir. 2013) (quoting <u>LeBrun</u>).

"[I]t is not enough to show that the authorities' representations were the but-for cause of a confession." <u>LeBrun</u>, 363 F.3d at 724. "To determine whether a statement is voluntary [the Court] examine[s] the totality of the circumstances, including the 'conduct of the officers and the characteristics of the accused.'" <u>United States v. Williams</u>, 793 F.3d 957, 962 (8th Cir. 2015) (quoting <u>LeBrun</u>, 363 F.3d at 724). The Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' ...." <u>Connelly</u>, 479 U.S. at 167. <u>See also</u> <u>United States v. Galceran</u>, 301 F.3d 927, 931 (8th Cir. 2002); <u>United States v. Robinson</u>, 20 F.3d 320, 322 (8th Cir. 1994).

Applying the forgoing standards, the undersigned finds that Temple's statements to Det. Sweeney were entirely voluntary and obtained in compliance with the law.

The video of the questioning is consistent with Det. Sweeney's testimony at the evidentiary hearing. In the video recording Temple does not appear to be in any significant physical, emotional, or psychological distress at any time during Det. Sweeney's questioning. Temple did not appear to be intoxicated, under the influence of any drugs or alcohol, going through withdrawal or any other form of discomfort that would interfere with his ability to understand his circumstances. Temple was dressed in street clothes and was not fully restrained—in the video his right hand does not appear to be in restraints. Temple was given

water and three breaks.  The breaks were neither particularly long nor short—each break lasting between about three minutes and eleven minutes.  Even including breaks and the time before Det. Sweeney entered the room and began questioning Temple, the entire interrogation lasted less than 90 minutes.  In view of the totality of the circumstances, including the seriousness of the allegations, the length of the interrogation was not coercive.

The video recording confirms that Det. Sweeney did not employ any coercive, unduly intimidating, or inappropriate means in questioning Temple.  Det. Sweeney did not raise his voice or physically or verbally intimidate or attempt to intimidate Temple.  Rather, both Det. Sweeney and Temple maintained a calm, even, and generally cordial demeanor throughout the entire interrogation.  Det. Sweeney was the only officer to question Temple and the only officer present in the interrogation room.

Det. Sweeney presented pieces of evidence to Temple, including photographs.  Det. Sweeney's questioning primarily focused on attempting to persuade Temple to discuss the circumstances of the homicides by encouraging Temple to give his version of events.  For example, Det. Sweeney advised Temple that he was the suspect in the March homicides and that a first degree murder charge carried greater punishment than lesser charges.  Det. Sweeney also asked some specific questions regarding Temple's aliases, phones, and his knowledge of particular locations relevant to the homicides.  Temple denied any involvement and was persistent in that regard.

Det. Sweeney indicated he could not make any promises to Temple as to how his case would play out.  When Temple asked Det. Sweeney if Temple was going to be charged with the murders, Det. Sweeney told him that he would be charged but also gave Temple an opportunity to provide any excuse.  Again, throughout this questioning, Temple maintained that he was not involved in the homicides.

46

Det. Sweeney advised Temple that he could take his time and think things over.  To the extent Det. Sweeney may have misrepresented anything to Temple, such as stating or implying what another witness may have said or what evidence may exist, or made any promises to Temple, such misrepresentations or promises clearly did not have the effect of impairing Temple's "capacity for self-determination."  See LeBrun, 363 F.3d at 724.  Throughout the entire procedure, Temple appeared calm and fully oriented as to his circumstances.  Temple often paused before answering questions and often responded with questions.  Temple's will was never overborne and he clearly understood that he had the ability to end questioning.  In fact, when Temple stated that he would like to plead "the Fifth," Det. Sweeney immediately ceased questioning in any form.

Upon a review of the totality of the circumstances, Temple knowingly, voluntarily, and intelligently waived his Miranda rights and made voluntary statements to Det. Sweeney.  There basis in this record to conclude that Temple was coerced or that his will was overborne in any manner.

### 4.    Prompt Presentment Issue

Temple briefly contends that his statements to Det. Sweeney should be suppressed because he was not taken before a Magistrate Judge as soon as practicable.  Temple's brief argument suggests that the police violated the prompt presentment rule, as reflected in Fed. R. Crim. P. 5(a)(1)(A) and 18 U.S.C. § 3501(c).  Rule 5(a)(1)(A) provides that –

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local officer as Rule 5(c) provides, unless a statute provides otherwise.

Section 3501(c) provides that –

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement

47

officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.

Temple's prompt presentment argument does not entitle him to any relief.  Rule 5 and § 3501(a) apply only to statements "made <u>after</u> a person is arrested on <u>federal</u> charges."  <u>Pugh</u>, 25 F.3d at 674 (emphasis in <u>Pugh</u>) (citing <u>United States v. Alvarez-Sanchez</u>, 511 U.S. 350, 358 (1994)).  As the Eighth Circuit explained in <u>Pugh</u>, "[the Supreme] Court reasoned that 'delay' cannot occur until an officer has a duty to present a person to a federal magistrate judge and that such a duty 'does not arise until the person has been arrested for a <u>federal</u> offense.'"  <u>Id.</u> (emphasis in <u>Pugh</u>) (quoting <u>Alvarez-Sanchez</u>, 511 U.S. at 358).

On April 24, 2015, Temple was arrested by St. Louis police, solely on state charges.  (<u>See</u> Gov't Exhs. 11A, 11B, 12A, 18)  Det. Sweeney's interrogation focused on state homicide matters.  There was never a mention of federal charges.  Although the United States Secret Service assisted in the effort to locate and arrest Temple on April 24th, the Secret Service agents were not involved in the homicide investigation or any other investigation involving Temple. The Secret Service did not participate in the physical arrest of Temple or any questioning of Temple.  As a result of his arrest on April 24th, Temple was held solely in state custody and solely on state charges.

Like the defendants in <u>Alvarez-Sanchez</u> and <u>Pugh</u>, Temple "was arrested by state officers for violations of state law.  He was arrested on [April 24, 2015] and made incriminating

statements on that same day, but was not [charged] for violations of federal law until [May 12, 2015].  There was no 'delay' in [Temple's] presentment because, at the time he made his incriminating statements, there was no obligation to present him to a federal magistrate judge." Pugh, 25 F.3d at 674.  Temple has not argued, and there is no indication in the record, that Temple's is "one of those 'rare' cases where, despite an arrest by state officers on state charges, § 3501(c) is implicated because state and federal officers colluded to deprive [him] of his right to prompt presentment." Id. at 675 n.4 (citing Alvarez-Sanchez, 511 U.S. at 359); see also United States v. Cooke, 853 F.3d 464, 470-71 (8th Cir. 2017).  Temple was not charged federally for several weeks.

For the foregoing reasons, Temple's argument that his statements to Det. Sweeney should be suppressed due to a prompt presentment violation cannot be sustained.

### E.      Fruit of the Poisonous Tree Analysis – Temple's Statements on April 24, 2015

Temple also argues that his statements to Det. Wasem and Det. Sweeney must be suppressed as fruit of the poisonous tree.  In this regard, Temple claims he was arrested without a valid warrant and that the use of a Cell Site Simulator to locate his cell phone tainted his arrest.  First, it is beyond reasonable dispute that Det. Wasem arrested Temple pursuant to an outstanding Missouri felony arrest warrant.  Second, as explained in greater detail in a subsequent section of this Report and Recommendation, Temple's statements on April 24, 2017, need not be suppressed due to the use of a Cell Site Simulator.  Temple was arrested on a public street and the use of a Cell Site Simulator to locate Temple's cell phone does not in any way warrant the suppression of any statements.  See United States v. Patrick, 842 F.3d 540 (7th Cir. 2016).

Temple's motion to suppress statements should be denied.

49

III.    **Motion to Suppress Physical Evidence**

Temple filed a detailed and comprehensive Motion to Suppress Physical Evidence (ECF No. 21).  Temple's Motion to Suppress Physical Evidence, as filed, asked the Court to suppress evidence associated with and/or connected to the following events:  (1) a State of Missouri warrant, issued April 2, 2015, directed to T-Mobile cell phone account (314) 203-9177; (2) a State of Missouri Court Order, issued April 23, 2015, for locating a cell phone with the number (314) 665-8458; (3) a search incident to the arrest of Temple on April 24, 2015; (4) a search of a house at 5036 Newport Avenue, St. Louis, MO, on April 24, 2015; (5) a seizure and search of a 1998 blue Buick LeSabre, on May 13, 2015; and (6) evidence seized pursuant to a traffic stop on January 19, 2015.

Temple later confirmed that he is no longer pursuing suppression of the evidence seized as a result of the January 19, 2015, traffic stop.  Accordingly, the substance of January 2015 traffic stop issue is not discussed herein and that aspect of his motion should be denied as moot.

Many of Temple's arguments in favor of suppression rest on his foundational contention that the police used Cell Site Simulator technology to locate and arrest him without lawful authority to do so.  Therefore, the undersigned will first address issues related to Cell Site Simulators, as used in this particular case.

A.    **Use of a Cell Site Simulator**

Regarding his arrest and the search of 5036 Newport, Temple focuses a substantial percentage of his arguments on the use of a Cell Site Simulator to locate a cell phone he was using.  According to Temple, using a Cell Site Simulator to locate a cell phone is a search within the meaning of the Fourth Amendment.  Temple contends that the police failed to obtain a valid search warrant authorizing the use of a Cell Site Simulator and, therefore, any evidence seized on April 24, 2015, must be suppressed as fruit of the poisonous tree.  The government concedes that

50

the police used two Cell Site Simulators on April 24, 2015.  The government contends that the police had lawful authority to deploy and use a Cell Site Simulator in this case, and that the police relied on that authority in good-faith.  The government also contends that Temple was actually located and arrested via visual surveillance methods, which did not depend upon Cell Site Simulator location information.

As will be explained below, for multiple reasons, the undersigned concludes that the use of Cell Site Simulator technology in this matter does not require the suppression of any evidence. In this regard, the undersigned assumes that Temple has demonstrated standing sufficient to challenge any surveillance associate with '8458 cell phone that implicates Fourth Amendment concerns.

### 1.    General Background Information – Cell Site Simulators

"When powered on, a cell phone is (among other things) a radio transmitter that automatically announces its presence to a cell tower or 'cell site' via a radio signal over a control channel which does not itself carry the human voice."  United States v. Bermudez, 2006 WL 3197181 at *6 (S.D. Ind. June 30, 2006) (citing In re application for Pen Register and Trap/Trace device with Cell Site Location Authority, 396 F.Supp.2d 747, 751 (S.D. Tex. 2005)).  Generally speaking, when on (and not in airplane mode) a cell phone "is constantly seeking the best reception," and checking for cell tower/site, "regardless of whether a call is made."  Id. (citing In re Application of U.S. for an Order Authorizing Installation and Use of a Pen Register and a Caller Identification System, 402 F.Supp.2d 597, 599 (D. Md. 2005)).  Cell phones are designed to seek, identify, and connect with the cell tower having the best signal in the area.  See Jones v. United States, -- A.3d --, 2017 WL 4211499, *3 (D.C. App. Ct. Sept. 21, 2017) (describing cell phone technology in the context of Cell Site Simulators); see also Howard W. Cox, "StingRay Technology and Reasonable Expectations of Privacy in the Internet of Everything," 17 The

Federalist Society Review 29, 29-30 (Feb. 2016) ("By the inherent design of cell phone technology, all cell phones constantly 'self-connect' with the cellular carriers via cell towers. This feature allows the device to identify and connect with the tower with the best local signal, and maintain the strongest possible signal.").

This connectivity between a cellular device and cell tower makes intuitive sense—the telephone service provider must know where a mobile device is located in order to route a call to that device and the device must have access to a cell site in order to place a call, through a provider, to another device. This basic and routine connectivity does not convey the contents of communications. This routine connectivity does not convey precise location information—the service provider only knows that the phone is within the general range of a cell tower.[20]

As the record before the Court demonstrates, law enforcement can exploit the automatic connectivity occurring between cellular devices and cell towers in order to attempt to locate a particular cellular device. This is done by using a Cell Site Simulator. Such devices are sometimes referred to as "IMSI catchers," "digital analyzers," or one of a host of specific device names such as Stingray, Triggerfish, Kingfish, Hailstorm, and others. See, e.g., In re Application for an Order Relating to Telephones Used by Suppressed, 2015 WL 6871289 at * (N.D. Ill. Nov. 9, 2015) [hereinafter "N.D. Illinois CSS Order"]; see also State v. Andrews, 134 A.3d 324 (Md. App. 2016). United States Magistrate Judge Johnston has aptly noted that "the moniker 'cell-site

---

[20] Cell phones and cellular providers have a capability to determine precise location information (e.g., location data from a phone's built-in GPS capability) via a function sometimes referred to as E-911. See United States v. Wallace, 866 F.3d 605, 607 (5th Cir. 2017); United States v. Lopez-Acosta, 2014 WL 3828225, *2 n.2 (D. Neb. Aug. 4, 2014); see also United States v. Abarca, 2014 WL 12641951, *3 (N.D. Fla. Nov. 20, 2014) (describing how E-911 location information is determined). Temple has not raised any issues concerning the use of E-911 functionality to locate cellular devices, and E-911 capability and limitations are not further discussed herein.

simulator' is … self-explanatory.  The device does exactly what its name describes:  it simulates a cell site."  <u>N.D. Illinois CSS Order</u>, 2015 WL 6871289 at *2.[21]

Although the Department of Justice has not conceded that a warrant (or an exception to the warrant requirement) is always necessary to use a Cell Site Simulator, in September 2015, it promulgated guidance which requires federal agents to meet a probable cause standard, in most circumstances, in order to use Cell Site Simulator technology.  <u>See Department of Justice Policy Guidance:  Use of Cell Site Simulator Technology</u> (Sept. 3, 2015), <u>http://www.justice.gov/opa/file/767321/download</u>.  As recently noted by the Seventh Circuit, assuming the Department of Justice Policy Guidance is accurate—

> Cell-site simulators ... function by transmitting as a cell tower. In response to the signals emitted by the simulator, cellular devices in the proximity of the device identify the simulator as the most attractive cell tower in the area and thus transmit signals to the simulator that identify the device in the same way that they would with a networked tower.
>
> A cell-site simulator receives and uses an industry standard unique identifying number assigned by a device manufacturer or cellular network provider.  When used to locate a known cellular device, a cell-site simulator initially receives the unique identifying number from multiple devices in the vicinity of the simulator. Once the cell-site simulator identifies the specific cellular device for which it is looking, it will obtain the signaling information relating only to that particular phone.  When used to identify an unknown device, the cell-site simulator obtains signaling information from non-target devices in the target's vicinity for the limited purpose of distinguishing the target device.
>
> By transmitting as a cell tower, cell-site simulators acquire the identifying information from cellular devices.  This identifying information is limited, however.  Cell-site simulators provide only the relative signal strength and general direction of a subject cellular telephone; they do not function as a GPS locator, as they do not obtain or download any location information from the device or its applications.  Moreover, cell-site simulators used by the Department must be configured as pen registers, and may not be used to collect the contents of any communication, in accordance with 18 U.S.C. § 3127(3).  This includes any

---

[21] Judge Johnston also noted that, despite the confidentiality regarding Cell Site Simulators, information regarding such devices is actually available.  <u>See</u> <u>N.D. Illinois CSS Order</u>, 2015 WL 6871289 at *2 (citing <u>Department of Justice, Electronic Surveillance Manual</u> (June 2005), <u>http://www.justice.gov/criminal/foia/docs/ele-sur-manual.pdf</u>).

> data contained on the phone itself:   the simulator does not remotely capture emails, texts, contact lists, images or any other data from the phone.   In addition, Department cell-site simulators do not provide subscriber account information (for example, an account holder's name, address, or telephone number).

United States v. Patrick, 842 F.3d 540, 542-43 (7th Cir. 2016) (quoting See Department of Justice Policy Guidance:  Use of Cell Site Simulator Technology (Sept. 3, 2015) at 2).  When used to locate a known device/phone number, a Cell Site Simulator becomes "the best" cell tower in a vicinity and, therefore, cellular devices in that vicinity indulge their programmed preference to seek the best service and connect to the Cell Site Simulator.  The Cell Site Simulator then looks for cellular devices in the vicinity to identify any device that has subscriber information matching the target cellular device (e.g., the electronic serial number "ESN" or international mobile subscriber identification ("IMSI")).  See N.D. Illinois CSS Order, 2015 WL 6871289 at *2.  If so, then the Cell Site Simulator can lock on and provide direction and signal strength information to the operator.

     As explained by Special Agent Davis at the evidentiary hearing, to locate a known cell phone, a Cell Site Simulator does not provide specific location information akin to GPS data (i.e., latitude and longitude coordinate data).  Rather, the Cell Site Simulator provides a direction and a signal strength metric that can be used in connection with other information (e.g., professional judgment and/or prior information regarding a suspect's activities and whereabouts or visual surveillance) to ascertain a likely location of the target cellular device.

     Based on the evidence adduced at the evidentiary hearing, including Special Agent Davis's testimony regarding his use of a Cell Site Simulator, as well as court decisions concerning Cell Site Simulators, the undersigned finds that the Cell Site Simulator used to locate Temple's cell phone was operated consistently with the description of Cell Site Simulators found in the Department of Justice Policy Guidance.

## 2.    Was there a Fourth Amendment Search?

In order for Temple's Cell Site Simulator arguments to gain any traction, the Court must first consider whether the use of a Cell Site Simulator to locate a known cell phone constitutes a search for Fourth Amendment purposes in the context of the facts of this case.  The Fourth Amendment provides that –

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  The question of whether locating a suspect's cell phone using Cell Site Simulator technology is a Fourth Amendment search is an open question in the Eight Circuit, and the law in this area is evolving nationally.  As noted above, the Department of Justice has taken the position of requiring federal agents to meet a probable cause standard before using Cell Site Simulator technology.  But this guidance post-dates the events in Temple's case, and the undersigned does not read the government's arguments in Temple's case as a concession that probable cause-based warrants are always required to use a Cell Site Simulator.

The question of whether and when the use of a Cell Site Simulator amounts to a search presents a complex issue under existing law.  The signals exploited by a Cell Site Simulator are those that a cell phone necessarily broadcasts routinely in order to allow the carrier to connect calls to/from the device.  These signals do not convey the content of any communications, and therefore do not implicate any wiretap considerations under Title III.  18 U.S.C. § 2510 et seq.

There are competing views as to the best approach, from a criminal procedure perspective, for addressing Cell Site Simulators.  The United States District Court for the Northern District of California recently discussed, in considerable detail, the competing views regarding the level of process necessary to employ a Cell Site Simulator to locate a cellular

55

device.  See United States v. Ellis, -- F.Supp.3d --, 2017 WL 3641867, *1-10 (N.D. Cal. Aug. 24, 2017).

While the Eighth Circuit has yet to decide whether and under what circumstances the use of a Cell Site Simulator to locate a phone amounts to a "search," in addition to the Northern District of California, several other courts, including federal courts, have recently considered this issue.  The District of Columbia Court of Appeals, the Northern District of California, and the Southern District of New York have each recently held that a person has a reasonable expectation of privacy in his or her real time cell phone location such that the use of a Cell Site Simulator to locate the cell phone is a search which would require a warrant or an exception to the warrant requirement.  See Jones, 2017 WL. 4211499, *8 (concluding that the use of a Cell Site Simulator to locate a suspect was a Fourth Amendment Search); Ellis, 2017 WL 3641867, *6 (relying on United States v. Lambis, 197 F. Supp.3d 606 (S.D.N.Y. 2016)).[22]  Similarly, in 2016 the Court of Special Appeals of Maryland Court held that a pen register and trap-and-trace order was insufficient to authorize the use of a Cell Site Simulator to locate a suspected murderer.  See Andrews, 134 A.3d at 327, 349 (holding "that people have a reasonable expectation of privacy in real-time cell phone location information").

When it comes to cell phone surveillance, one might suggest that there is an "elephant in the room."  In its 2017-18 term, the Supreme Court is expected to hear argument on a distinct, but partially related issue regarding historical cell site location data.  See United States v. Carpenter, 819 F.3d 880 (6th Cir. 2016), cert. granted, 137 S. Ct. 2211 (June 5, 2017).  In Carpenter, the Sixth Circuit held that law enforcement could obtain historical cell site information, from a cellular provider, without first obtaining a warrant.  Id. at 890.  The Sixth Circuit found that such historical cell site records were routine business records of the provider,

---

[22] The Lambis decision is discussed in greater detail below.

and obtaining those records from the provider did not amount to a Fourth Amendment search. Id.  Thus, Carpenter addresses location surveillance, albeit historical rather than real time, but it does not address the use of Cell Site Simulators.  Our Court need not speculate in this case how a future decision in Carpenter might impact surveillance techniques such as those involving Cell Site Simulators.

For several reasons, which are each discussed in greater detail below, it is not necessary in Temple's case to affirmatively decide the question of whether and under what circumstances, law enforcement officers would be required to obtain a warrant before employing a Cell Site Simulator to locate a suspect's cellular device.

First, for purposes of deciding Temple's motion to suppress physical evidence seized on April 24, 2015, the undersigned will assume that the use of a Cell Site Simulator was a Fourth Amendment search.  The undersigned also concludes, however, that the April 23rd Court Order (Gov't Exh. 2A) satisfies all of the necessary requirements for a search warrant.  For Fourth Amendment and exclusionary rule purposes, it does not matter that the document is not specifically denominated as a "search warrant," or that the order may not have complied with Missouri procedural rules and did not mention Cell Site Simulator technology by name.

Second, even if the April 23rd Court Order is not a warrant, the police were in possession of a valid arrest warrant.  Any Fourth Amendment concerns are reasonably addressed and vindicated when that arrest warrant is considered in conjunction with the April 23rd Court Order (which was issued pursuant to a finding of probable cause).

Third, even if there was a defect in the April 23rd Court Order such that it was not a valid warrant, the police and U.S. Secret Service were justified in relying on that order as authorizing the use of a Cell Site Simulator to locate Temple's cell phone.  Accordingly, under the good-faith

exception to the exclusionary rule, this Court need not suppress any evidence obtained as a result of the use of Cell Site Simulator technology to locate Temple's phone.

Fourth, all of the evidence obtained after the use of the Cell Site Simulator to locate Temple's phone would have been inevitably discovered. The record supports the government's contention that, in an effort to locate and arrest Temple on April 24, 2015, the police were actively and simultaneously pursuing lawful, traditional surveillance techniques in addition to seeking temporary assistance from a Cell Site Simulator. The record supports a conclusion that, on April 24, 2015, the police would have located and arrested Temple, and identified 5036 Newport Avenue as a property of interest, regardless of the use of the Cell Site Simulator to attempt to locate Temple's cell phone and to actually locate Temple's cell phone, albeit briefly.

### 3. Did the April 23rd Court Order Satisfy the Fourth Amendment Warrant Requirement?

Temple contends that the April 23rd Court Order does not constitute a valid search warrant which would authorize the use of a Cell Site Simulator to locate his cell phone. The undersigned disagrees. As an initial matter, for Fourth Amendment and suppression purposes, the fact that the application requested (and received) an "order" as opposed to a document specifically entitled "search warrant" is not outcome dispositive.[23] See Dalia v. United States, 441 U.S. 238 (1979) (holding that a court order authorizing a wiretap was a warrant for Fourth

---

[23] To the extent Temple argues that evidence should be suppressed because the April 23rd Court Order violated Missouri rules and procedures that argument is contrary to Eighth Circuit precedent. In general, evidence is not suppressed for violations of state law absent a violation of the Fourth Amendment, even if the search is executed by state officers. See United States v. Faulkner, 826 F.3d 1139, 1146 (8th Cir. 2016) (citation omitted); see also United States v. Hornbeck, 118 F.3d 615, 617 (8th Cir. 1997).

Section 542.276 RSMo. details the general requirements for Missouri search warrants and applications. Temple has argued in this matter that the April 23rd Court Order is not denominated as a "search warrant." Nothing in § 542.276 requires an applicant or issuing judge to style the document as a "search warrant." In fact, having reviewed § 542.276, it appears to the undersigned that the April 23rd Court Order largely if not completely complied with § 542.276.

Amendment purposes); United States v. Sykes, 2016 WL 8291220 at *10 (E.D.N.C. Aug. 22, 2016) (citing Dalia).  What matters, rather, is the substantive question of whether the April 23rd Court Order meets the constitutional requirements for a search warrant.  The undersigned believes that it does.

"The Fourth Amendment requires that search warrants be issued only upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Dalia, 441 U.S. at 255 (internal quotations omitted).  In Dalia, the Supreme Court explained that valid warrants "require only three things."  Id.  "First, warrants must be issued by neutral, disinterested magistrates."  Id. (citations omitted).  Second, the warrant may issue only upon a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense."  Id. (quoting Warden v. Hayden, 387 U.S. 294, 307 (1967)).  Third, the warrant "must particularly describe the things to be seized as well as the place to be searched."  Id. (citations and quotations omitted).

The April 23rd Court Order regarding Temple's cell phone (the '8458 cell phone) satisfies each of these requirements.  First, the Court Order was issued by a Missouri Associate Circuit Judge.  The judge signed both the affidavit and the order, fully satisfying the neutral and disinterested magistrate requirement.

Second, the probable cause requirement is also met in this case.  Probable cause "depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place."  United States v. Faulkner, 826 F.3d 1139, 1144 (8th Cir. 2016) (citation omitted), cert. denied, 137 S. Ct. 2092 (2017).  See also Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); United States v. Keys, 721 F.3d 512, 518 (8th Cir. 2013); Fed. R. Crim. P. 41.  Probable cause is "a fluid concept—turning on the

assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983).  Probable cause may be found in hearsay statements from reliable persons, Gates, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, Draper v. United States, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948).  While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive.

Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. Gates, 462 U.S. at 230.  It is well-established that, when the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted); see also United States v. Farlee, 757 F.3d 810, 819 (8th Cir.), cert. denied, 135 S. Ct. 504 (2014); United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995).  After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. Gates, 462 U.S. at 236.  Thus, "[t]he affidavit should be examined under a common sense approach and not in a hypertechnical fashion." Solomon, 432 F.3d at 827 (citation and quotations omitted). See also United States v. Ventresca, 380 U.S. 102, 109 (1965); Gladney, 48 F.3d at 312 (explaining that "[a]ffidavits must be read in a common-sense and realistic fashion") (citations and quotations omitted).

Applying these principles, the application for the April 23rd Court Order supplies ample probable cause.  In support of the application, Det. Wasem deposed and stated a detailed set of supporting facts, including the following:

60

1. Jacobi Temple had a street name of "KJ," and was using the '8458 cell phone;
2. There was an active felony arrest warrant for Temple, and that Temple had prior arrests for resisting arrest;
3. Temple was a suspect in a homicide investigation;
4. A reliable confidential informant had assisted law enforcement in identifying the '8458 cell phone as a phone used by Temple, that Temple sold heroin in the Bevo Mill area of St. Louis, that Temple was armed, and that Temple used the '8458 cell phone for narcotics trafficking;
5. The CI was corroborated by identifying Temple from a photograph and making contact with Temple via the '8458 cell phone shortly before the application; and
6. Law enforcement needed to monitor the movements of the '8458 cell phone to locate and/or arrest Temple.

(Gov't Exh. 2A at pp. 4-5)  The undersigned finds that Det. Wasem's application provided probable cause to conclude that Temple had an outstanding felony arrest warrant, Temple was then using the '8458 cell phone, and locating the '8458 cell phone would assist in locating and arresting Temple.  See Hayden, 387 U.S. at 307.  Further, the April 23rd Court Order affirmatively states that it was issued on the basis of probable cause (Gov't Exh. 2A at p. 7, 9), and that finding is entitled to deference upon review.  See Gates, 462 U.S. at 236; Solomon, 432 F.3d at 827.

Third, the April 23rd Court Order satisfies the Fourth Amendment's particularity requirement.  The April 23rd Application and Court Order identify a host of information relating to the '8458 cell phone, and the Order authorizes law enforcement to precisely locate the cell phone used by Temple.[24]  Paragraph 9 of the Court Order directs T-Mobile to provide "[t]wenty-

---

[24] To the extent the duration of the Court Order might inform a particularity analysis, the Court Order limited prospective location gathering to a period of ten days past the date of the order, and sought historical information for the time period of thirty days prior to the date of the order.  (Gov't Exh. 2A at p. 8)  Nothing regarding the duration of the Court Order detracts from the undersigned's conclusion that the Court Order in this case satisfies the Fourth Amendment's particularity requirement.  Moreover, the record demonstrates that the police relied on the April 23rd Court Order for a few hours on April 24, 2015.  Thus, the concerns regarding extended

four hour a day assistance to include switch based solutions including precision location pursuant to probable cause based information queries and all reasonable assistance to permit the aforementioned Agencies to triangulate target location, including but not limited to terminating interfering service on the target telephone." (Gov't Exh. 2A at p. 9) Although the language is clumsy in parts, the undersigned finds that the Order states with sufficient particularity that the Court Order authorizes the investigating agencies (which specifically included the SLMPD and the U.S. Secret Service) to precisely locate the '8458 cell phone, including by triangulation by those agencies. Regardless of whether the issuing Associate Circuit Judge knew or understood that a Cell Site Simulator might be employed, that Judge no doubt knew that her order was going to be used by the investigating agencies to attempt to precisely locate the '8458 cell phone.

To be sure, the application and Court Order do not specifically mention the use of a Cell Site Simulator, and the exact details of how the police intended to locate the phone were not identified in the application or Court Order. Although such details are useful they are not required.[25] The Eighth Circuit has recently reaffirmed that, "[a]lthough … the Fourth Amendment requires a warrant to describe particularly 'the things to be seized,' there is no requirement that 'search warrants … include a specification of the precise manner in which they are to be executed.'" United States v. Merrell, 842 F.3d 577, 581 (8th Cir. 2016) (quoting Dalia v. United States, 441 U.S. 238, 255, 257 (1979)). "We generally leave the 'details of how best to

_____

surveillance identified and suggested in the concurring opinions of United States v. Jones, 132 S. Ct. 945 (2012) are not implicated by the surveillance actually employed in this matter.

[25] The September 2015 Department of Justice Guidelines for use of Cell Site Simulators referred to above make clear that it will usually be the better practice to obtain a warrant and explicitly disclose the intention to employ a Cell Site Simulator. This type of transparency will make judicial review more precise and accurate, remove uncertainty and misperceptions, increase respect for our rule of law, facilitate a more robust debate regarding the use of Cell Site Simulators, and eliminate unnecessary litigation.

proceed with the performance of a search authorized by warrant' to the judgment of the officers responsible for the search."  Id. (quoting Dalia, 441 U.S. at 257).

In Dalia, the Supreme Court addressed a situation which is instructive to Temple's case. In Dalia, the FBI obtained a court order authorizing the interception of oral communications occurring within a criminal suspect's office.  See 441 U.S. at 242, 256.  Although the application and court order were silent about covert entry into the office, the FBI snuck into the suspect's office at midnight and spent several hours installing a bug in the ceiling.  Id. at 245, 255.  The Supreme Court rejected an argument that the court "order was insufficient under the Fourth Amendment for its failure to specify that it would be executed by means of a covert entry of [the] office."  Id. at 256-57.  The Supreme Court explained that –

> [n]othing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed.  On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection against unreasonable searches and seizures.

Id. at 257 (footnote and internal quotations omitted).  The Court further rejected the Dalia defendant's contention that, "warrants for electronic surveillance are unique," even if "the specificity required by the Fourth Amendment does not generally extend to the means by which warrants are executed."  Id.  The Court explained that "[i]t would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the [issuing] court must set forth precisely the procedures to be followed by the executing officers."  Id.

Certainly if the court order premised on the application in Dalia, which was silent regarding covert entry into a private office, satisfied the Fourth Amendment warrant

requirement, Det. Wasem's application and the corresponding April 23rd Court Order, which expressly indicated an intention to precisely locate a cell phone, including by triangulation, also satisfied the warrant requirement.

The Seventh Circuit recently addressed a situation analogous to Temple's case.  In United States v. Patrick, 842 F.3d 540 (7th Cir. 2016), the police had an arrest warrant for Patrick due to parole violations.  The police obtained a search warrant that authorized the police to locate Patrick using cell-phone data.  Using a Cell Site Simulator, the police located and arrested Patrick, and in the process also seized a gun.  Patrick was charged with being a felon in possession of a firearm and unsuccessfully moved to suppress the gun, leading to an appeal to the Seventh Circuit.  Id. at 541-42.  The application and warrant authorizing the police to locate Patrick's cell phone did not mention that the police would be using Cell Site Simulator technology.  See id. at 542 (noting that the fact that the police even used a Cell Site Simulator did not come to light until the case was on appeal).  Further, the government conceded on appeal that the use of a Cell Site Simulator was a Fourth Amendment search, but argued that the police were not required to explain to the issuing judge how the warrant to locate Patrick's phone would be executed.  Id. at 544.

The Seventh Circuit upheld Patrick's conviction and the constitutionality of his arrest and the subsequent seizure of his handgun.  That court explained "that neither constitutional text nor precedent suggests that 'search warrants also must include a specification of the precise manner in which they are to be executed.'  The manner of search is subject only to 'later judicial review as to its reasonableness.'"  Id. at 544 (quoting Dalia, 441 U.S. at 256, 259); see also id. (further explaining "that courts cannot limit a warrant to as to foreclose a particular means of execution") (citing Richards v. Wisconsin, 520 U.S. 385 (1997)).  Thus, according to the Seventh Circuit, "the police could have sought a warrant authorizing them to find Patrick's cell phone and kept

64

silent about how they would do it.  Or affidavits and the warrant itself might have said that 'electronic means that reveal locations of cell phones.'"  Id.

In Temple's case, the affidavit and Court Order clearly indicated that the police intended to precisely locate Temple's cell phone, including by triangulation.  Further, the manner of execution was reasonable.  Det. Wasem's testified that the police conducted physical surveillance in the area where they believed Temple operated.  As for locating Temple's cell phone, Det. Wasem explained that the police first requested assistance from the provider (T-Mobile) pursuant to the April 23rd Court Order, but the information provided was only accurate to about 1,000 meters, which was insufficient to locate Temple.[26]  Thereafter, the investigative team requested the assistance of a Cell Site Simulator operated by the SLMPD.  The record establishes that the SLMPD were not successful in locating Temple's phone with their Cell Site Simulator.  The only Cell Site Simulator that actually tracked and located Temple's cell phone was operated by Special Agent Davis of the U.S. Secret Service.  The record further indicates that the Secret Service's Cell Site Simulator only locked on to Temple's phone for approximately one minute and did not reveal the intimate details of the interior of any location for which Temple arguably maintained an expectation of privacy, including the residence at 5036 Newport.

Furthermore, although radio traffic reflects that the Secret Service concluded that Temple's phone was most likely in the 5036 Newport residence, the police did not take any action on that information.  Rather, the police continued to conduct visual surveillance in an area where Temple had previously been observed by the investigative team, and further confirmed that 5036 Newport was the most likely location by speaking with a neighbor who identified the house as a problem property.

---

[26] Temple has not challenged any evidence the police obtained from the cellular provider pursuant to the April 23rd Court Order.

Temple's arguments rely to a substantial degree on a district court decision in United States v. Lambis, 197 F. Supp.3d 606 (S.D.N.Y. 2016).  In Lambis, Drug Enforcement Agency ("DEA") agents obtained a warrant for pen register information with cell site location information ("CSLI") to locate a suspect's phone, but did not request or receive authority for precise location information, including information from a Cell Site Simulator.  Id. at 608-09. The agents used the CSLI information to obtain general vicinity information, but that information lacked sufficient precision to pinpoint a specific building or apartment.  Id. at 609. Accordingly, the agents deployed a Cell Site Simulator to pinpoint a specific apartment unit within an apartment building, which belonged to Lambis.  Officers obtained consent to search from Lambis and recovered drugs and related items.  Id.  The district court granted Lambis's motion to suppress, finding that the warrantless use of a Cell Site Simulator to locate Lambis's cell phone was an unreasonable search.  Id. at 611.  According to that court, although the agents had a valid warrant for CLSI, using a Cell Site Simulator to precisely locate the phone exceeded the scope of search authorized by the warrant.  Id.  Thus, the court held that the search was unreasonable even though there was a warrant.

Temple's case is distinguishable from Lambis.  In Temple's case, the April 23rd Court Order unambiguously identifies that its scope includes precisely locating Temple's cell phone. In contrast, the CSLI information at issue in Lambis is not precise information.  As explained above, the fact that Det. Wasem's application and the corresponding court order do not mention the use of a Cell Site Simulator by name is by no means fatal.  See Dalia, 441 U.S. at 256, 259; Patrick, 842 F.3d at 544.

To the extent Temple contends that Cell Site Simulators also gather signaling information for phones other than his, such a contention would not entitle him to suppression.  As the Seventh Circuit explained in Patrick, "if the problem with simulators is that they are too

66

comprehensive, that would not lead to suppression—though it might create a right to damages by other persons whose interests were unreasonably invaded." Patrick, 842 F.3d at 545. Temple "is not entitled to invoke the rights of anyone else; suppression is proper only if the defendant's own rights have been violated." Id. (citing United States v. Payner, 447 U.S. 727 (1980)); see also United States v. Wright, 844 F.3d 759, 762 (8th Cir. 2016) (explaining that "Fourth Amendment rights are personal rights and may not be vicariously asserted") (citation omitted), cert. denied, 137 S. Ct. 2279 (2017).

Finally, at times during the litigation of his suppression motions, Temple has raised concerns suggesting that Cell Site Simulators can allegedly intercept communications such as phone calls or text messages. Whether or not that capability exists in some other context, it is not relevant to this case. The undersigned specifically asked Special Agent Davis whether the Cell Site Simulator intercepted phone calls, texts, or other content-based information and he affirmatively stated that it did not. The undersigned credits Special Agent Davis's testimony in all respects. In fact, the radio traffic makes abundantly clear that the police and Secret Service were not monitoring the contents of any communications in their attempts locate Temple or his cell phone.[27]

---

[27] Temple also argues that the radio traffic includes "sonar" sounds and contends that those are the sounds of a Cell Site Simulator. There was arguably conflicting testimony on this fact. Special Agent Davis (who was a Cell Site Simulator operator) said that he did not believe that the sound was a Cell Site Simulator, but Det. Wasem (who was not an operator) thought that the sounds could be from a Cell Site Simulator. Based on the testimony of S/A Davis, the undersigned finds that the Secret Service Cell Site Simulator did not produce a sonar sound. Still, giving Temple every benefit of the doubt, his concerns do not entitle him to suppression or any further discovery. It is undisputed that the SLMPD deployed a Cell Site Simulators to try to locate Temple. It is also beyond dispute that only the Secret Service Cell Site Simulator actually managed to locate Temple's cell phone, the SLMPD was unsuccessful in locating Temple's cell phone using its Cell Site Simulator. Thus, even assuming that the SLMPD were required to obtain a warrant before using a Cell Site Simulator, and further assuming that the SLMPD did not have an appropriate warrant in this case, at best Temple has shown a potential yet "unsuccessful" Fourth Amendment violation by the SLMPD because they never precisely

In summary, the undersigned finds as follows: (1) the April 23rd Court Order was issued on the basis of probable cause; (2) the April 23rd Court Order was subscribed and sworn to by Det. Wasem before a neutral and detached magistrate; and (3) the April 23rd Court Order particularly described the place to be searched and the things to be seized (the precise location of Temple's cell phone). Accordingly, the April 23rd Court Order satisfied all requirements for a warrant under the Fourth Amendment, and because the manner of execution was reasonable, Temple is not entitled to suppress any evidence seized as a result of the use of a Cell Site Simulator to locate his cell phone in this case.

### 4. Does the Existence of a Valid, Pre-existing Felony Arrest Warrant for Temple Justify Using a Cell Site Simulator in this Case?

Even if the April 23rd Court Order does not satisfy the Fourth Amendment's warrant requirements, the reasonableness of the police conduct in this case should be evaluated in light of the fact that the police had a valid warrant to arrest Temple for unlawful use of a weapon resisting arrest, and property damage. The arrest warrant was issued before any attempt to locate and arrest Temple. (Gov't Exhs. 11A and B; testimony of Det. Wasem)

The presence of an arrest warrant has implications that are relevant to the complicated question of whether a separate search warrant was required at all to track Temple's cell phone. In Payton v. New York, 445 U.S. 573 (1980), the Supreme Court held that, "for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. As Judge Boggs of the Sixth Circuit recently explained—

> The logic in Payton is that the Fourth Amendment requires the government to obtain a warrant before entering the arrestee's home, but whether the warrant must

---

located Temple's cell phone. In fact, the SLMPD Cell Site Simulator was unsuccessful even though visual surveillance had identified Temple's "home base" as about halfway down the 5000 block of Newport Avenue.

be an arrest warrant or a search warrant is not a question answered definitively by the constitutional text, and in the case of a fugitive subject to a valid arrest warrant, the arrest warrant "will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen."

Riley, 858 F.3d 1012, 1020 (6th Cir. 2017) (Boggs, J., concurring) (quoting Payton, 445 U.S. at 602-03), petition for certiorari docketed, No. 17-5943 (Sept. 12, 2017).  Judge Boggs emphasized that there is a meaningful distinction between fugitives for whom there is a valid arrest warrant, and mere suspects.  Id.

Judge Boggs's concurring opinion in Riley explains that, if an arrest warrant suffices to permit law enforcement to enter a fugitive's home, "which stands at the 'very core' of Fourth Amendment protection, … then it may reasonably require the same individual to open the doors of his phone—at least so far as to disclose the longitude and latitude coordinates emitted by a phone that the individual chooses to carry and turn on."  Id. (emphasis in original) (citing Silverman v. United States, 365 U.S. 505, 511 (1961)).  Under Judge Boggs's analysis, the police could lawfully use technology to precisely locate a fugitive suspect's cell phone if (1) there is a valid arrest warrant, and (2) the police officers "tracking him have at least reasonable suspicion that he is in possession of the phone being tracked."  Id. at 1019.

Judge Boggs buttressed his concurring opinion by identifying several factors that weigh against a suspect's expectation of privacy in location information associated with his cell phone.[28]  First, although "a fugitive does not forfeit all his expectation of privacy," the police

---

[28] The defendant in Riley was located using GPS information supplied by a phone company.  Yet that information was precise and, at least for purposes of evaluating a fugitive's expectation of privacy in their location, the use of a Cell Site Simulator would not appear to alter Judge Boggs's reasoning and analysis.

A prior district court case in the Seventh Circuit came to a similar conclusion—a valid felony arrest warrant would, for Fourth Amendment purposes, justify the use of a Cell Site Simulator to locate and arrest a fugitive.  See United States v. Bermudez, 2006 WL 3197181, *8-10 (S.D. Ind. June 30, 2006), aff'd sub nom., United States v. Amaral-Estrada, 509 F.3d 820 (7th Cir. 2007).  Bermudez involved cell phone location technology to locate and arrest a fugitive

may enter that fugitive's home upon only "reasonable suspicion that the arrestee is at home." Id. at 1021. Second, the location information gathered does not include content data and provides nothing regarding the interior of a home other than the location of the phone. Id. (distinguishing Kyllo v. United States, 533 U.S. 27 (2001) (thermal imaging case)). Third, "although … the third-party doctrine itself does not provide a basis for using technology to detect activity within a home, the fact that cell-phone users voluntarily disclose their location data by keeping their phones turned on weighs against finding their location data to be private." Id.

Judge Boggs' concurring opinion carries considerable logical and persuasive force.[29]  In Temple's case the police had even more—they had a valid felony arrest warrant and a court order based on a judicial finding of probable cause—more than the reasonable suspicion Judge Boggs's analysis would require.  If reasonableness is the touchstone of the Fourth Amendment, and it is, see United States v. Lewis, 846 F.3d 937, 945 (8th Cir. 2017), the use of a Cell Site

with an outstanding arrest warrant.  The district court in Bermudez conducted an expansive review of the statutes and case law relating to cell phone location tracking.  In that case, the court found that, although the agents had a court order, the order did not permit real time location data. Id. at *7.  The court concluded, however, that the valid "Arrest Warrant gave law enforce the authority to physically enter the target's home in order to search for the target, see Payton v. New York, 445 U.S. 573, 603 (1980), … and also gave law enforcement the authority to conduct a less intrusive search for the fugitive by tracking cell phone location information in an effort to locate him, even if it invaded the apartment he rented." Id. at *11.

[29] Judge Boggs's position and the decision in Bermudez are not alone in this emerging area.  Relying on the majority and concurring opinions of the Sixth Circuit's decision in Riley, a District Judge in the Middle District of Florida recently held that, when "[a]rmed with the arrest warrant and reasonable suspicion that [the suspect] used the cell phone number, law enforcement did not need a search warrant to use GPS location tracking on [the suspect's] phone." United States v. Ponce, 2017 WL 3251494, *6 (M.D. Fla. July 31, 2017).

Closer to home, in United States v. Taylor, 4:15 CR 335 CDP (DDN) (Order and Recommendation, ECF No. 159), United States Magistrate Judge David Noce declined to suppress evidence allegedly derived from the use of a Cell Site Simulator where, inter alia, there was an earlier-issued arrest warrant for the defendant which authorized entry into the residence the agents reasonably believed he lived.  (Order and Recommendation at 22-23, citing United States v. Glover, 746 F.3d 369, 373 (8th Cir. 2014)).

70

Simulator to locate Temple's cell phone in this case was reasonable.  Fourth Amendment concerns were fully vindicated by the previously issued arrest warrant and a probable cause based court order establishing that Temple was using the cell phone to be tracked.

### 5.    Does the Good-Faith Exception to Exclusionary Rule Apply?

Again, assuming that the April 23rd Court Order is lacking the requirements of a warrant, the undersigned finds that the investigators relied on that Court Order in good-faith when using Cell Site Simulators in this case.

"[The] exclusionary rule does not apply 'when an officer acting with objective good-faith has obtained a search warrant from a judge or magistrate and acted within its scope." United States v. Jackson, 784 F.3d 1227, 1231 (8th Cir. 2015) (quoting United States v. Leon, 468 U.S. 897, 921 (1984)).  "The Court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant."  Id.  (citations omitted).  This good-faith exception to the exclusionary rule, however, does not apply in the following situations:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
> (2) when the issuing judge "wholly abandoned [the] judicial role" in issuing the warrant;
> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and
> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

Id. at 1231 (quoting Leon, 468 U.S. at 923).  "In assessing the objective reasonableness of a police officer's execution of a warrant, [reviewing courts] must look to the totality of the circumstances, including any information known to the officer but not presented to the issuing judge."  Id.

71

Although the document in question is denominated a Court Order, that distinction alone does not preclude application of the good-faith exception to the warrant requirement.  See Ellis, 2017 WL 3641867, *13-16 (applying Leon good-faith analysis in denying motion to suppress evidence obtained pursuant to a Cell Site Simulator used pursuant to a pen register order and not a warrant); see also United States v. Wallace, 866 F.3d 605, 609 (5th Cir. 2017) (applying Leon where the investigators obtained E-911 location data for suspect's phone pursuant to a court order, not a warrant).

In Temple's case, there are no false statements or material omissions from the sworn facts included in Det. Wasem's application to locate the '8458 cell phone.  Further, nothing in the record suggests that the Missouri Associate Circuit Judge wholly abandoned her judicial role in signing the order permitting the police to precisely locate the '8458 cell phone.  The affidavit itself recited more than sufficient probable cause for a judicial officer to determine that evidence sought (i.e., the precise location of the '8458 cell phone) would aid in the apprehension of Temple.  See Hayden, 387 U.S. at 307.

While the April 23rd Application and corresponding Court Order certainly could have been more clear as to how the police intended to locate Temple's cell phone, there was no doubt that the police intended to locate his phone precisely in an effort to arrest Temple.  Thus, one cannot say that the April 23rd Court Order was so facially deficient that no police officer could reasonably presume it to be valid.  U.S. Secret Service Agent Davis testified that that he relied on the April 23rd Court Order as his authorization to locate and attempt to locate the '8458 cell phone.  S/A Davis did not begin operations until after he had obtained a copy of the April 23rd Court Order.  The face of that order clearly states that it applied to the SLMPD and U.S. Secret Service, among other law enforcement agencies.  Again, any reasonable reading of the April 23rd Court Order makes abundantly clear that the primary purpose of the order was to allow

72

those law enforcement agencies to precisely locate the '8458 cell phone so that Temple could be arrested. Moreover, S/A Davis testified that he operated the Cell Site Simulator in specific reliance on the language in the April 23rd Court that allowed law enforcement agencies to triangulate the target phone's location.

Finally, the law regarding location-based surveillance is evolving. There is no binding Eighth Circuit precedent regarding the standards for using Cell Site Simulators to locate a fugitive's cellular device. The law was less clear in April 2015, and the United States Department of Justice guidance regarding Cell Site Simulators and warrants did not issue until September 2015, several months after the events in controversy herein. The Supreme Court has made clear that the focus of the exclusionary rule is on deterrence, explaining that "the significant costs of this rule have led us to deem it 'applicable only … where its deterrence benefits outweigh its substantial social costs.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)); see also United States v. Horton, 863 F.3d 1041, 1051 (8th Cir. 2017) (applying Leon to warrant authorizing a so-called Network Investigative Technique which was void ab initio, and explaining that "[r]egardless of the type of warrant at issue[,] '[t]he Supreme Court has effectively created a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, the benefits of deterrence must outweigh the costs.'") (quoting United States v. Master, 614 F.3d 236, 243 (6th Cir. 2010)); Wallace, 866 F.3d at 609 (affirming a denial of a motion to suppress evidence in part because the question of whether obtaining E-911 data was a Fourth Amendment search remained an open question in the Fifth Circuit).

Despite the lack of clarity in the law regarding cell phone location surveillance, before employing a Cell Site Simulator in this case, Det. Wasem presented a sworn application for a court order authorizing the investigators to precisely locate Temple's cell phone. In

circumstances such as those presented herein, suppressing evidence obtained in good-faith reliance of a facially valid court order which was fully supported by probable cause would serve no useful deterrent purpose.

Based on the totality of the circumstances, the undersigned concludes that, even if there was a defect concerning the April 23rd Court Order resulting in a Fourth Amendment violation, the good-faith exception to the exclusionary rule applies and no evidence should be suppressed as a result.

### 6.    Does the Inevitable Discovery Exception to the Exclusionary Rule Apply?

The government argues that Temple was ultimately tracked and located using conventional surveillance techniques.  According to the government, the evidence obtained as a result of the use of a Cell Site Simulator to locate and arrest Temple need not be suppressed under the fruit of the poisonous tree doctrine if the government demonstrates that such evidence would have been inevitably discovered.  See United States v. Allen, 713 F.3d 382, 387 (8th Cir. 2013); see also Nix v. Williams, 467 U.S. 431, 444 (1984).

For the inevitable discovery exception to the exclusionary rule to apply, the government must show, "by a preponderance of the evidence, that:  (1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct; and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation."  United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008) (citing United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998)); see also Allen, 713 F.3d at 387.

The undersigned finds that the government has met its burden regarding inevitable discovery.  For purposes of clarity and to facilitate later review, the undersigned will separately

74

consider the evidence flowing from Temple's arrest and the evidence seized from 5036 Newport Avenue, because each requires unique considerations.

### a.  Inevitable Discovery – Evidence Derived from Temple's Arrest

The facts and evidence adduced at the evidentiary hearing established that, on April 24, 2015, Det. Wasem arrested Temple on a public street, pursuant to a valid felony arrest warrant. Therefore, Temple's arrest was lawful.  See Steagald v. United States, 451 U.S. 204, 213 (1981); see also Utah v. Strieff, 136 S. Ct. 2056, 2062 (2016) ("A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.") (quoting Leon, 468 U.S. at 920 n.21); United States v. Santana, 427 U.S. 38, 42 (1976).  The Cell Site Simulator was not used to generate any probable cause for Temple's arrest.  Accordingly, even if the police lacked lawful authority to use a Cell Site Simulator, and even if the police would not have located Temple but for the use of a Cell Site Simulator, Temple's arrest would remain lawful and the evidence derived therefrom would not be suppressed.  As the Seventh Circuit succinctly stated in a similar context involving a Cell Site Simulator, "[a] fugitive cannot be picky about how he is run to ground."  See Patrick, 842 F.3d at 545.

Furthermore, the evidence adduced at the evidentiary hearing, including the radio traffic and testimony, shows by more than a preponderance of the evidence that the police would have located and arrested Temple on April 24, 2015, regardless of the presence and use of any Cell Site Simulator.  First, the police had a facially valid felony arrest warrant and were actively trying to locate and arrest Temple.  The evidence shows that, prior to any attempt to precisely locate Temple's phone by any means, the police believed he was operating in the Bevo Mill area of St. Louis, and specifically in the vicinity of where he was ultimately arrested.  Police officers were actively engaged in physical surveillance, with multiple officers in the general area where

they suspected they might locate Temple. Prior to using a Cell Site Simulator to locate Temple's phone, the police positively identified Temple and two other persons walking in public in the area of surveillance. Although the police eventually lost visual surveillance and employed a Cell Site Simulator to attempt to locate Temple's cell phone, the police maintained the use of visual surveillance in the area throughout the time in question. In fact, the radio traffic confirms that an officer visually identified the area of Newport Avenue as Temple's "home base" without reliance on any Cell Site Simulator.

More importantly, the radio traffic and testimony establish that the police did not act on the Cell Site Simulator information to arrest Temple. Instead, the Police continued visual surveillance and waited for Temple to emerge. Temple eventually emerged back on a public street, again in the company of other persons. The police again maintained traditional, visual surveillance of Temple during this time and, eventually apprehended him after a foot chase.

Temple's arrest was not tainted by the use of a Cell Site Simulator and he was arrested pursuant to a valid, outstanding felony arrest warrant. Both prongs of the inevitable discovery inquiry have been satisfied: (1) there is a "reasonable probability" police would have inevitably observed Temple leave the 5036 residence and would have arrested him, even in the absence of the minimal use of a Cell Site Simulator; and (2) the police were actively conducting visual surveillance in the area before, during, and after the limited use of any Cell Site Simulator. See Thomas, 524 F.3d at 858.

Having concluded that the inevitable discovery rule applies to Temple's arrest, and Temple was arrested pursuant to a valid felony warrant, there is no need to suppress any evidence seized incident to arrest.

The undersigned finds that Temple was lawfully arrested on April 24, 2015, and any evidence seized from his person pursuant to that arrest should not be suppressed as it was seized

lawfully under the search incident to arrest doctrine.  See United States v. Robinson, 414 U.S. 218, 235 (1973) (search incident to arrest rule); United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004) ("A search incident to arrest is justified by the concern for officer safety and the need to collect evidence ... [b]ut the presence of either justification need not be established in a particular case.") (citation omitted).[30]

### b. Inevitable Discovery – Evidence Seized from 5036 Newport Avenue

The search of 5036 Newport presents similar as well as different factual considerations from Temple's arrest.  Again, prior to employing any Cell Site Simulator or any attempt to precisely locate Temple's suspected cell phone, the police had been and were conducting traditional investigatory techniques in the area of 5036 Newport.  Such techniques included visual surveillance and a confidential source.  As recounted above, the testimony and radio traffic demonstrate that the police had been using visual surveillance to monitor Temple's movements until his whereabouts were lost in the 5000 block of Newport.  Detective Early identified the 5000 block of Newport as the suspects' home base.  Thereafter, SLMPD attempted to locate Temple's phone with precision but where unsuccessful.  The Secret Service briefly used a Cell Site Simulator to surmise that the phone was most likely in 5036 Newport.  The police, however, did not immediately act on that information.  Rather, the police continued with the previously established visual surveillance.  In fact, the radio traffic makes clear that the police remained unsure as to whether the house of interest was 5036 or 5040 Newport.[31]  The police did

---

[30] Temple's motion to suppress statements is addressed in greater detail earlier in this Report and Recommendation.  There is also no basis to suppress any of Temple's statements as the fruit of the poisonous tree due to the use of a Cell Site Simulator.

[31] The radio traffic includes statements from an officer who was positioned on or near Newport.  That officer notes that the suspects came from a street behind the school, and his later

not attempt to conduct a knock and talk until after Det. Wasem confirmed with a neighbor that 5036 Newport was a problem residence.  The radio traffic regarding the neighbor's assessment occurred after the police had apprehended both Temple and Syms, but before they had located Spires, who, as it turns out, had returned to 5036 Newport.

The evidence shows that the police had located the significance of the 5000 block of Newport Avenue as part of the on-going visual surveillance.  Even after receiving Cell Site Simulator information suggesting that 5036 Newport was the most likely property of interest, the police persisted with conventional and no doubt constitutional investigatory techniques involving visual surveillance and contacting neighbors.  The police did not approach 5036 Newport for a knock and talk until after a neighbor identified it as a problem property.

Both prongs of the inevitable discovery inquiry have been satisfied:  (1) there is a "reasonable probability" police would have inevitably located 5036 as a residence to approach for a knock and talk, even in the absence of the minimal use of a Cell Site Simulator; and (2) the police were actively pursuing a substantial, constitutional, alternative line of investigation apart from the use of a Cell Site Simulator or any attempt to precisely locate the suspect cell phone and apart from any indication that the phone was inside 5036 Newport.[32]  See Thomas, 524 F.3d at 858.

_____

statements indicate that he was talking about Newport.  Government's Exhibit 3B corroborates this officer in that Newport runs behind the school at St. John the Baptist.

[32] In his concurring opinion in Thomas, Judge Colloton opined that the Eighth Circuit's use of a "reasonable probability" standard is potentially "overinclusive."  524 F.3d at 861-62 (Colloton, J., concurring).  Judge Colloton noted a "'[r]easonable probability' means something less than 'more likely than not.'"  Id. at 861 (citation omitted).  Judge Colloton points out that the Eighth Circuit standard dilutes the standard of Nix v. Williams, which likely requires a higher standard, such as "more likely than not."  Id. at 861-62.  Even applying this higher standard, the undersigned finds that it is more likely than not that the police would have discovered the evidence at issue, regardless of the use of a Cell Site Simulator on April 24, 2015.  This conclusion applies to Temple's arrest as well as the knock and talk at 5036 Newport.

The ultimate question of whether the evidence seized from 5036 Newport should be suppressed is separately analyzed below pursuant to traditional consent analysis and considerations. That evidence, however, should not be suppressed due to the use of a Cell Site Simulator in this case.

### B.    Search of 5036 Newport Avenue

It is not disputed that the police searched 5036 Newport Avenue without a warrant and, apart from consent, the government does not advance any independent basis to justify that search.

Temple has raised several arguments in support of his motion to suppress evidence seized from 5036 Newport Avenue. Temple's principle argument is that Myesha Strickland did not voluntarily consent to a search of 5036 Newport, and only relented when the police allegedly threatened or pressured her. Temple also contends that the police conducted a protective sweep of the residence before securing Ms. Strickland consent. Temple also argues that, pursuant to Georgia v. Randolph, 547 U.S. 103, 122-23 (2006), Ms. Strickland lacked authority to consent after Sam Spires affirmatively denied entry to the police. Finally, Temple briefly argues that the government failed to prove that Ms. Strickland had any authority, actual or apparent, to consent to a search of the entire premises of 5036 Newport.

### 1.    Temple's Standing to Challenge the Search of 5036 Newport

Before addressing the merits of any of Temple's arguments, the Court must first consider Temple's standing—whether he had a reasonable expectation of privacy relative to the Newport Avenue home. The government has argued that Temple lacks standing to challenge the search of 5036 Newport, noting that Temple told the police that he did not live at the Newport residence.

Although the Fourth Amendment protects individuals against unreasonable searches and seizures, "Fourth Amendment rights are personal rights that may not be asserted vicariously."

United States v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004) (citing Rakas v. Illinois, 439 U.S. 128, 133-34 (1978)).  Therefore, a person seeking suppression of evidence on the basis of a Fourth Amendment violation "'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'"  Id. (quoting Minnesota v. Carter, 525 U.S. 83, 88 (1998)).  A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched … has no standing to claim that they were searched or seized illegally."  Id. at 529-30 (internal quotation and citation omitted).  See also United States v. Russell, 847 F.3d 616, 618 (8th Cir. 2017) (quoting Barragan).   In Minnesota v. Olsen, 495 U.S. 91, 98-100 (1990), the Supreme Court held that an overnight guest enjoys a legitimate expectation of privacy in the host's home, and thus standing to claim Fourth Amendment protections relative to that home.  In Carter, "the [Supreme] Court distinguished an 'overnight social guest' from someone 'merely present with the consent of the householder' with no enforceable Fourth Amendment right in the premises."  United States v. Kuenstler, 325 F.3d 1015, 1020 (8th Cir. 2003).

Temple did not live full time at the 5036 Newport Avenue home.  Yet Temple was a frequent visitor and overnight guest.  And even though Temple told the police that he lived elsewhere, he also stated that he sometimes slept on the couch at Newport.  Sam Spires testimony supports a conclusion that Temple was an overnight guest on the evening of April 23, 2015 into the day of April 24, 2015.  This testimony is corroborated by the surveillance conducted by the police on April 24, 2015, and the fact that Temple had mail at the 5036 Newport residence.  The undersigned concludes that that Temple has made a sufficient showing of standing and the Court should address the merits of the consent to search issue.[33]

---

[33] Where a court "finds facts supporting both sides such that it is not 'well positioned' to determine if a party had a reasonable expectation of privacy, it can examine instead the validity

## 2.    **Legal Principles and Framework - Consent**

"The Fourth Amendment shields individuals from unreasonable searches and seizures by law enforcement.  United States v. Ramirez, 676 F.3d 755, 759 (8th Cir. 2012).  '[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions[.]'"  United States v. Anderson, 688 F.3d 339, 343 (8th Cir. 2012) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  "Voluntary consent of the person whose home or property has been searched is [one such] recognized exception."  Anderson, 688 F.3d at 343-44 (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).  See also Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  "'Consent searches are part of the standard investigatory techniques of law enforcement agencies' and are 'a constitutionally permissible and wholly legitimate aspect of effective police activity.'"  Fernandez v. California, 134 S. Ct. 1126, 1132 (2014) (quoting Schneckloth, 412 U.S. at 228).  Thus, "[c]onsensual searches are reasonable under the Fourth Amendment."  United States v. Beckmann, 786 F.3d 672, 677-78 (8th Cir. 2015) (citing Florida v. Jimeno, 500 U.S. 248, 250-51 (1991)).

It is the prosecution's burden to prove by a preponderance of the evidence that consent to search was voluntary.  See United States v. LeBeau, 867 F.3d 960, 970 (8th Cir. 2017) (citation omitted).  Consent is voluntary "if it was 'the product of an essentially free and unconstrained choice by its maker,' … rather than 'the product of duress or coercion, express or implied.'"  United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (quoting Bustamonte, 412 U.S. at 225, 227).[34]  In determining whether consent was voluntary, courts consider the totality of the

---

of the search."  Marshall v. United States, 2008 WL 2775857 *6 (E.D. Mo. July 14, 2008) (quoting Kuenstler, 325 F.3d at 1021).

[34] "[T]he voluntariness of a defendant's consent to search is a question of fact …."  Beckmann, 786 F.3d at 678 (citing United States v. Quintero, 648 F.3d 660, 665 (8th Cir. 2011)).

circumstances, including the characteristics of the accused and details of the environment in which the consent was given. See id. at 380-81; United States v. Kelley, 594 F.3d 1010, 1013 (8th Cir. 2010) (quoting Chaidez).

Consent need not be from a defendant or suspect. Consent need only come from a person possessing actual or apparent authority over the place or effects to be searched. See Georgia v. Randolph, 547 U.S. 103, 109 (2006). "That person might be the householder …, or a fellow occupant who shares common authority over the property, when the suspect is absent, … and the exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant …." Id. (internal citations omitted). See also Rodriguez, 497 U.S. at 187-88; Anderson, 688 F.3d 339, 345 (8th Cir. 2012) ("Consent may [also] be obtained ... 'from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'") (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)); United States v. Lindsey, 702 F.3d 1092, 1096 (8th Cir.) (explaining that the police are not required to verify a third party's authority to consent and may "form their impressions from context") (internal quotations and citations omitted), cert. denied, 133 S. Ct. 2842 (2013). The prosecution bears the burden of establishing the common authority of the consenting person. See Rodriguez, 497 U.S. at 181.

### 3.    *Georgia v. Randolph* Concerns

It is not disputed that the police never asked Temple or Demonte Syms for consent to search the Newport home. The police, however, were not required to seek their consent. "When officers obtain valid third-party consent, they are not also required to seek consent from a

---

"[T]he reasonableness of an officer's reliance on such consent is a question of law …." Id. (citing United States v. James, 353 F.3d 606, 615 (8th Cir. 2003)).

defendant, even if [that defendant] is detained nearby…. '[A] potential objector, nearby but not invited to take part in the threshold colloquy loses out.'"  United States v. Amratiel, 622 F.3d 914, 917 (8th Cir. 2010) (citing United States v. Matlock, 415 U.S. 164, 171 (1974) and quoting Georgia v. Randolph, 547 U.S. 103, 121 (2006)), cert. denied, 562 U.S. 1247 (2011).

It is also not disputed that, when the police first attempted a knock and talk at the door of 5036 Newport, Sam Spires responded but denied the police entry without a search warrant. Temple argues that, pursuant to Georgia v. Randolph, 547 U.S. 103 (2006), once Spires denied entry Ms. Strickland was deprived of any authority to override that decision.

The general rule regarding consent is that police need only obtain consent from one resident of a jointly occupied home or property.  Fernandez, 134 S. Ct. 1133; Amratiel, 622 F.3d at 917.  Randolph reflects a narrow exception to that general rule.  Id.; see also United States v. Hudspeth, 518 F.3d 954, 959 (8th Cir. 2008) (en banc).  In Randolph, the Supreme Court held that a warrantless search of a marital residence violated the Fourth Amendment where the wife consented to the search but the husband, who was also physically present, expressly refused consent.  Randolph, 547 U.S. at 115, 122-23.

In Fernandez the Supreme Court decided a fact pattern that demonstrated the narrowness of the Randolph exception.  In that case, the police knocked on an apartment door which was answered by a woman who had been in a fight.  The defendant then appeared at the door and refused entry to the police.  Suspecting abuse, the police removed the defendant from the premises and arrested him.  The police then returned to the apartment and requested and received oral and written consent to search the apartment from the woman who previously answered the door.  Id. at 1130.  The police seized various items of evidentiary value and the defendant was eventually charged with felony offenses.  Id. at 1130-31.  Prior to trial, the defendant unsuccessfully moved to suppress the seized items and he was convicted.  The state appellate

courts affirmed his convictions and the denial of his motion to suppress, concluding that "an objecting occupant's physical presence is indispensable to the decision in Randolph." Id. at 1131 (internal quotations and citation omitted). The Supreme Court affirmed.

The Supreme Court rejected the defendant's argument that an objecting occupant's presence is not required when there is evidence to conclude that the police removed that occupant for the sake of avoiding a possible objection. Instead, the Supreme Court noted that an objective standard applies, not the subjective intent of the investigating officers. Id. at 1134. The Court held, therefore, "that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason." Id. The Supreme Court also rejected the defendant's secondary argument that his initial objection to police entry remained effective unless and until he later changed his mind and withdrew his objection. Fernandez, 134 S. Ct. at 1135-36.

Temple's contention that Myesha Strickland lacked consent due to Spires's earlier refusal to consent to the police cannot be sustained. In making this decision, the undersigned will assume that Spires had authority to withhold consent, an assumption that may not be warranted on this record. Although Spires refused entry to the police, he voluntarily left the home through the rear and surrendered to the police. There is no dispute that Spires was lawfully detained and removed from the premises at that point. Thus, unlike the defendant in Fernandez, who was involuntarily removed and arrested, Spires left the premises on his own. Spires was no longer physically present, and pursuant to Fernandez his prior refusal to the police no longer controlled the question of consent. Stated differently, with Spires voluntarily absent, another joint occupant of the 5036 Newport residence could consent regardless of Spires's prior refusal. Finally, neither Temple nor Syms were physically present and there is no evidence to suggest that Temple or Syms refused consent.

For these reasons, the Court should deny Temple's challenge to Ms. Strickland's consent on the basis of <u>Georgia v. Randolph</u>.

### 4. Nature and Scope of Myesha Strickland's Authority to Consent

Temple also argues that the government failed to prove that Ms. Strickland had any authority, actual or apparent, to grant consent to search the entire residence. Temple contends that the government failed to prove that Ms. Strickland had authority to grant consent to search all rooms and any bedroom, even though she testified that she lived in the residence.

As noted above, consent may be from anyone having actual or apparent authority over the premises searched. <u>See</u> <u>Randolph</u>, 547 U.S. at 109; <u>Anderson</u>, 688 F.3d at 345. The prosecution bears the burden of establishing common authority. <u>Rodriguez</u>, 497 U.S. at 181.

By his own argument, Temple admits that Ms. Strickland lived at the 5036 Newport residence. The evidence adduced at the evidentiary hearings in this matter put that question beyond any doubt. Ms. Strickland testified that she lived at 5036 Newport. After Spires left the home, she answered the door when the police knocked. The police were justified in objectively concluding that she had authority to consent to a search.

Further, the evidence showed that it was Tabitha Hunt's residence. Ms. Hunt is Syms's mother. Ms. Strickland lived at the residence with Ms. Hunt, Syms, and their infant child. On that basis alone, the police could objectively conclude that Ms. Strickland had common authority relative to the entire home. This authority was later validated because the police permitted Ms. Strickland to contact Ms. Hunt so that Ms. Hunt could respond to the residence. Significantly, there is no indication in the record that Ms. Hunt withdrew or questioned any prior consent provided by Ms. Strickland.

Additionally, Temple should not be heard to complain about the search of any bedroom. Although the undersigned has found that Temple arguably has standing to challenge the search

of 5036 Newport generally, Temple has not shown that he had any separate and individually protected, reasonable expectation of privacy in any particular room of the house.  See Rakas, 439 U.S. at 130 n.1 (the party challenging a search has the burden of showing a reasonable expectation of privacy in the area searched).  The evidence supporting Temple's standing relative to the Newport residence generally was thin, but included that he sometimes slept on a couch and had mail there.  In contrast, there is no evidence to suggest that Temple exercised exclusive dominion or control over any area of the house that was in any way superior to or exclusive of Ms. Strickland's authority.  In fact, the evidence is to the contrary.

The evidence before the Court is that, on April 24, 2015, 5036 Newport was Ms. Hunt's house, and Ms. Strickland lived there with her boyfriend Syms, their minor son.  Temple, on the other hand, lived elsewhere but was sometimes an overnight guest at the Newport home.

The government has sufficiently shown that Ms. Strickland had actual authority greater to any authority arguably possessed by Temple to consent to a search of the entire residence.  Temple's claim that the government failed to demonstrate that Ms. Strickland possessed actual or apparent authority to consent to a search of the entire residence cannot be sustained.

### 5.    Voluntariness of Myesha Strickland's Consent

Temple's principle argument regarding consent focuses on the voluntariness of Ms. Strickland's consent.  As noted above, it is the prosecution's burden to prove voluntariness by a preponderance of the evidence.  See LeBeau, 867 F.3d at 970 (8th Cir. 2017) (citation omitted).  Consent is not voluntary if it is the product of duress or coercion.  See Chaidez, 906 F.2d at 380.  Pursuant to the Eighth Circuit's guidance in Chaidez, district courts examine the totality of the circumstances, in view of the following factors:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] Miranda rights; and (4) whether the individual was aware,

through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted).  See also

Chaidez, 906 F.2d at 381.  The Chaidez factors, however, are not "applied mechanically," but

serve to guide the analysis.  Id.  Further, the standard is an objective one—the subjective state of

mind at time person allegedly gave consent is not determinative, see United States v. Ortega-

Montalvo, 850 F.3d 429, 434 (8th Cir. 2017), but the government must show that a reasonable

person would have believed that "consent was freely and voluntarily given and not a result of

duress and coercion," United States v. Escobar, 389 F.3d 781, 785 (8th Cir. 2004) (citations

omitted).  There is no requirement that an officer specifically advise a suspect that he or she can

refuse to consent to a search.  See United States v. Lyton, 161 F.3d 1168, 1171 (8th Cir. 1998).

### a.      Alleged Threat to Call DFS

The parties agree that Ms. Strickland gave consent to search 5036, including in writing

(Gov't Exh. 4), but disagree as to whether her consent was voluntary or coerced.  Temple argues

that the police coerced Ms. Strickland by threatening to call the Division Family Services

("DFS"), in essence a threat to have her infant son removed from her.  The government contends

that no such coercion occurred.  Thus, while the Court must consider the totality of the

circumstances in assessing the voluntariness of Ms. Strickland's consent, the most significant

Chaidez factors are the environmental factors focusing on whether the police used threats,

physical intimidation, or punishment, or made promises or misrepresentations to induce Ms.

Strickland's consent.  See Chaidez, 906 F.2d at 381.

If Det. Wasem threatened to call DFS such that Ms. Strickland faced the dilemma of either consenting to a search or risking custody of her infant child, that threat would most likely result in coercion sufficient to render Ms. Strickland's consent involuntary.  The question of whether Ms. Strickland's consent was voluntary resolves, primarily, to the resolution of conflicting testimony between Ms. Strickland's version of events and Det. Wasem's version.

Consistent with the findings of fact above, the undersigned credits Det. Wasem's testimony that he did not threaten to contact DFS, and does not credit Ms. Strickland's testimony that the police threatened to contact DFS.  Det. Wasem did not threaten Ms. Strickland.

The evidence before the Court is that, after the police arrested Temple, Spires and Ms. Strickland attempted to clear the residence of drug trafficking materials.  Working together, Spires and Ms. Strickland gathered up material which Spires then flushed down a toilet.  By the time Ms. Strickland responded to the door, she believed that most of the incriminating evidence was gone; her motive to withhold consent was greatly diminished.

The presence of a written consent form is highly probative in terms of the totality of the circumstances.  The written waiver of consent form Ms. Strickland signed included an acknowledgement in which she affirmatively represented that she had the right to refuse consent and that "no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to consent to the search [of 5036 Newport] or to sign this form."  (Gov't Exh. 4)  Ms. Strickland claims she was given only a second or two sign the form, but her testimony in this regard was internally inconsistent and at odds with Det. Wasem's testimony.  Ms. Strickland wrote her name on the form, dated the form, provided pedigree information that was then written on the form, and signed the form.  Det. Wasem testified that he confirmed that Ms. Strickland could read and gave her time to review the form before signing.

The undersigned finds that Ms. Strickland was given ample time to read and review the form and the police were justified in concluding that she had given consent to search the home.

In addition to the written consent form, other circumstances point to a conclusion that Ms. Strickland's consent was voluntary and not coerced. Ms. Strickland was permitted to contact Syms' mother, Tabitha Hunt, who responded to the residence. In fact, Ms. Strickland testified that she initiated the call and did not request permission, suggesting that she retained a great deal of free agency and undercutting her claim that the police used heavy handed tactics to induce her consent. Moreover, there is no suggestion in the record that Ms. Hunt withdrew the prior consent or that Ms. Strickland complained to Ms. Hunt about any threats. In fact, the evidence indicated that Ms. Hunt knew one or more of the officers. All of these additional circumstances undermine Ms. Strickland's contention that she was threatened in any inappropriate way.

For completeness, the remaining <u>Chaidez</u> factors are considered. At the time in question, Ms. Strickland was 22 years old, with a high school education. She was not intoxicated or under the influence of any drugs at the time she consented. She was not advised of her <u>Miranda</u> rights, but the written consent to search form advised her that she could withhold consent. Ms. Strickland was never in custody, restrained, or detained by the police. In fact, she has never been charged in connection with any of the events in question. Ms. Strickland gave consent initially at the front door of her own home, not a remote or secluded location and she thereafter completed a written form confirming her consent. Again, she was permitted to retain her telephone and call Ms. Hunt. After the police entered the home, Ms. Strickland did not object and when Ms. Hunt arrived she did not object either.

Based on the totality of the circumstances, the objective evidence before the Court leads the undersigned to conclude (1) the police did not threaten Ms. Strickland to induce her consent,

and (2) the government has met its burden of showing that Ms. Strickland's consent was given voluntarily.

### b.    Alleged Prior Claim of Lawful Authority to Search

A related consideration arises as a result of Sam Spires's testimony at the re-opened evidentiary hearing.  Spires testified that when the police knocked on the door and he refused entry, an officer claimed to have a search warrant but could not produce a copy of any warrant.  Det. Wasem denied telling Spires that the police had a search warrant and testified that he did not hear anyone else state that the police had a search warrant.

As noted, the prosecution bears the burden of proving voluntary consent, and that "burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) (finding coercion when an officer claims to have a warrant); see also Escobar, 389 F.3d at 785-86 (citing Bumper).   The undersigned credits Det. Wasem's testimony that he never told Spires that the police had a warrant and that he heard no other officer make such a claim.  It remains possible, but perhaps unlikely, that another officer made such a claim and Det. Wasem did not hear it.   But it is critical to recall that Spires voluntarily left the home a short time after his interaction with the police at the front door.  Ms. Strickland was the next to answer the door and she denied that any officer claimed to have a search warrant.  Therefore, assuming that an officer falsely represented to Spires that the police had a search warrant, such representation did not influence Ms. Strickland's consent.

### c.    Protective Sweep

Temple also argues that the police unlawfully searched the home before Ms. Strickland signed the consent to search form.  Relying on a case from the Eleventh Circuit, United States v. Tovar-Rico, 61 F.3d 1529 (11th Cir. 1995), Temple contends that the police effectively searched

90

the house under the guise of a protective sweep.  Therefore, Ms. Strickland's consent was not valid because she only opened the door and consented in response to a show of official authority.

A protective sweep is a limited and search of a location for that is conducted for safety purposes, not to locate evidence.  See United States v. Anderson, 688 F.3d 339, 346 (8th Cir. 2012) (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)).  See also United States v. Alatorre, 863 F.3d 810, 814 (8th Cir. 2017).

In Tovar-Rico, after conducting an undercover drug investigation, the police knocked loudly on a defendant's door and announced their identity and requested permission to enter. Until the police knocked, the defendant did not know that the police had been conducting an investigation in her building.  When the defendant opened the door, the police entered, guns drawn, and conducted a protective sweep of the apartment.  Thereafter, the police advised the defendant that she did not have to permit a further search, but if she declined they would return with a warrant.  The defendant agreed and gave written consent to search.  See id. at 1535-36. The district court suppressed the evidence, finding that the defendant could not possibly have believed she could refuse consent and, therefore, her written consent was involuntary.  The Eleventh Circuit affirmed, finding that the initial entry was illegal and the defendant's consent was not voluntary.  Id. at 1536.

The situation with Ms. Strickland is distinguishable.  First, unlike the defendant in Tovar-Rico, Ms. Strickland was keenly aware of the police presence and purpose of investigation long before she answered the door.  When Ms. Strickland opened the door, she knew the police wanted to search the house.  Before she spoke to Det. Wasem, Ms. Strickland participated in the destruction of narcotics-related evidence and Spires voluntarily left the residence shortly thereafter.  Second, Det. Wasem testified that the police entered the house only after discussions with Spires and then Ms. Strickland.  The police did not have their weapons drawn and there was

91

never a threat made to Ms. Strickland—either to call DFS or to obtain a search warrant if she refused entry. Throughout, Ms. Strickland's infant child remained asleep, corroborating Det. Wasem's testimony that his encounter with Ms. Strickland was calm in nature. Third, the police conducted a brief protective sweep, solely for the purpose of identifying whether anyone else remained in the house who might pose a danger. Det. Wasem explained that the investigation involved suspects who had been armed and dangerous. The police did not conduct any search for evidence. Rather, they called out for anyone else present to make themselves known. Thus, on these facts, a brief protective sweep was prudent and conducted solely for safety purposes.

After the protective sweep, Det. Wasem presented the consent to search form. As noted above, Ms. Strickland completed part of the form and she was given time to review it before signing it. In fact, the testimony adduced at the evidentiary hearing was that Ms. Strickland assisted the police in locating a weapon in the house. Such assistance would be consistent with Det. Wasem's testimony that the initial sweep was for safety purposes only, and not to locate evidence.

In summary, Ms. Strickland did not open the door to 5036 Newport Avenue and allow the police inside only in response to a claim of lawful authority. Rather, she allowed the police inside after she and Spires had attempted to rid the premises of drug-related evidence, and after speaking with the police at the door. By the time Ms. Strickland allowed the police inside, she knew why the police were there and that they wanted to search her house. The facts and circumstances are distinguishable from those in <u>Tovar-Rico</u>. There is no reason to suppress any evidence seized from 5036 Newport on the basis of a non-investigatory protective sweep completed before Ms. Strickland signed the written consent to search form.

### C.    Seizure and Search of Buick

Temple also requests that the Court suppress evidence obtained as a result of the seizure and subsequent search of 1998 blue Buick LeSabre automobile on May 13, 2015.  The government contends that Temple lacks standing to challenge this search.

As noted above, "Fourth Amendment rights are personal rights that may not be asserted vicariously."  Barragan, 379 F.3d at 529 (citation omitted)  In order to challenge the seizure and search of the Buick, Temple 'must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable[.]'" Id. (quoting Carter, 525 U.S. at 88).  A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched … has no standing to claim that they were searched or seized illegally." Id. at 529-30 (internal quotation and citation omitted).  Temple has failed to demonstrate standing.

The evidence adduced at the evidentiary hearings established that the Buick was neither owned by nor registered to Temple.  The car was registered in the name of "Oliver Cody." Further, when it came time to move the Buick, Syms made arrangements to have the car towed from the Newport residence to a location in South St. Louis.  Ms. Strickland also testified that it was Syms who arranged for the removal of the Buick from the front of the Newport residence. Temple has offered no evidence of a sufficiently close connection to the Buick to gain standing to challenge its seizure and subsequent search.

Additionally, even if Temple once had standing relative to the Buick, based on the totality of the circumstances, the undersigned finds that, when the police located the Buick on May 13, 2015, it had been abandoned.

"Abandoned property is outside the scope of fourth amendment protection because its owner has forfeited any expectation of privacy in it." United States v. Thomas, 451 F.3d 543, 545-46 (8th Cir. 2006) (citing United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997)). See

also United States v. Douglas, 744 F.3d 1065, 1071 (8th Cir. 2014); United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1995) ("The warrantless seizure of abandoned property does not violate the Fourth Amendment.") (citing Abel v. United States, 362 U.S. 217, 241 (1960)); United States v. Smith, 648 F.3d 654, 660 (8th Cir. 2011) (citation and internal quotation omitted). There is, therefore, nothing unlawful in the government appropriating and seizing abandoned property. See Abel, 362 U.S. at 241. "The issue is not abandonment in the strict property right sense, but rather, whether the defendant in leaving the property has relinquished [his] reasonable expectation of privacy so that the search and seizure is valid." United States v. Hoey, 983 F.2d 890, 892-93 (8th Cir. 1993). See also Smith, 648 F.3d at 660 (quoting same). The question of abandonment is an objective one, determined on the totality of the circumstances, "based on the objective facts available to the investigating officers at the time" of the challenged law enforcement conduct. United States v. Camberos-Villapuda, 832 F.3d 948, 952 (8th Cir. 2016) (citing United States v. Nowak, 825 F.3d 946, 948-49 (8th Cir. 2016)). "[A] verbal denial of ownership is not necessary for a finding of abandonment …." Nowak, 825 F.3d at 948 (citations omitted); see also United States v. Basinski, 226 F.3d 829, 836–37 (7th Cir. 2000) ("[I]t does not matter whether the defendant harbors a desire to later reclaim an item").

All of the objective facts available indicate that the Buick had been abandoned where Det. Sweeney found it. The car was parked in a location that was seemingly unrelated to anyone with an ownership interest, and certainly not Temple. The car had been towed almost a month earlier, yet it still displayed a weathered ticket from April 20, 2015. The vehicle was also littered with leaves and similar debris, indicating that nobody had returned to claim the car and that it had not been recently driven. (See Gov't Exhs. 5A1-A9, 5B)

Furthermore, even if the Buick was not abandoned, Det. Sweeney could lawfully search and seize it where he found it under the automobile exception to the search warrant requirement.

See Carroll v. United States, 267 U.S. 132, 160-62 (1925); United States v. Aguilera, 625 F.3d 482, 486 (8th Cir. 2010).  At the time Det. Sweeney located the Buick, he had sufficient probable cause to conclude that the vehicle likely contained evidence of a crime.  For example, Det. Sweeney had good reason to believe that the Buick had been used in the commission of the murders under investigation and that one of the victims had been in the car before.  The information provided by Syms, including the color, license plate information, and location of the car all proved to be reliable and accurate.

Finally, although he could have searched the Buick where he found it, Det. Sweeney photographed it and arranged to have it towed to a secure lot.  This makes sense because of the potential need to gather forensic evidence such as blood and DNA evidence.  At about 2:30 p.m., also on April 13, 2015, Special Agent Mark Wynn, ATF, applied for and obtained a federal warrant authorizing a thorough search of the Buick.  (See Gov't Exh. 5C, E.D. Mo. Case No. 4:15 MJ 6128 TCM)  That warrant was based on probable cause and issued in full compliance with the Fourth Amendment and Fed. R. Crim. P. 41.

In summary, Temple lacks standing to challenge the search of the blue Buick LeSabre, and even if he had standing, there would be no basis in law or fact to suppress any evidence obtained as a result of the seizure and search of the blue Buick LeSabre.

**D.**     **April 2, 2015, Search Warrant Directed to (314) 203-9177**

On April 2, 2015, Det. Sweeney applied for and obtained a State of Missouri Search Warrant directed to a T-Mobile wireless account having the phone number (314) 203-9177.  The application and warrant requested that T-Mobile provide the following:

> All information necessary to detail the various physical locations of [the described cell phone], between the times / dates of 12:00 A.M. on March 27, 2015, through present.  Information is to include, but not be limited to, subscriber information; incoming / outgoing calls; text messages; call origination / termination locations,

physical address of cell sites; and R.F. coverage maps for an area encompassing a 25 mile radius of the City of St. Louis, Missouri.

(Gov't Exh. 1A)

In his motion to suppress (ECF No. 231) Temple contends that the evidence seized as a result of the April 2nd Search Warrant should be suppressed for the following reasons:  (1) the warrant application lacks probable cause; (2) the application contains uncorroborated and unreliable information from a confidential source; (3) the warrant is overbroad; (4) the warrant does not meet the particularity requirements for the place to be searched; (5) the return and inventory are insufficient; (6) the information requested did not fall within the geographical jurisdiction of the Circuit Court for the City of St. Louis; and (7) the warrant was issued in violation of the Missouri Constitution.

The government counters that Temple has failed to identify his standing to challenge evidence obtained relative to the (314) 203-9177 account.  The government also contends that phone users do not have an expectation of privacy with respect to non-content information, such as basic subscriber information, call detail, and the switching equipment (e.g., cell towers) associated with their cellular phones.  The government further contends that the warrant for the (314) 203-9177 phone and account was valid, based on probable cause, and sufficiently particular.  Finally, the government contends that the officers' were justified in relying on the validity of the warrant under the <u>Leon</u> good-faith exception.

### 1.    Temple's Standing Relative to the (314) 203-9177 Cellular Account

In order to prevail on his motion to suppress evidence seized pursuant to the warrant directed to the (314) 203-9177 phone account, Temple must demonstrate his standing, that is a reasonable expectation of privacy in the account searched.  See <u>Barragan</u>, 379 F.3d at 529.  It is Temple's burden to establish standing.  See <u>Rakas</u>, 439 U.S. at 130 n.1.

The account was established on February 14, 2015, and it was not established in any name. (Gov't Exh. 1B-1) The government contends that the lack of any identifiable subscriber or using a fictitious name results in a lack of any expectation of privacy. (See ECF No. 263 at 16 n.6, citing cases) The undersigned does not agree that the failure to use a name, or using a fictitious name, necessarily results in a lack of any expectation of privacy. In United States v. Watson, 950 F.2d 505, 507 (8th Cir. 1991), the Eighth Circuit rejected the government's argument that a defendant lacked a reasonable expectation of privacy in a house he purchased using a fictitious name. The Eighth Circuit explained that legal ownership was not required and that present dominion and control would suffice. Id. In United States v. Herron, 2 F. Supp.3d 391, 400 (E.D.N.Y. 2014) the Eastern District of New York considered and rejected a similar argument where the defendant submitted an affidavit explaining why he used another name to register a cell phone and that he was the sole user of that phone.

In the present case, Temple has not offered any evidence from which the Court could reasonably conclude that he owned or controlled the (314) 203-9177 phone account. At best, the Court can infer such from the fact that the police were actively investigating the use of that phone by the person suspected of the March 27, 2015 murders and shooting, and that the phone number (314) 203-9177 was found in a surviving victim's phone and connected to other related accounts and matters. Yet when interviewed on April 24, 2015, Temple stated he did not think he had a phone that ended in the number 9177.

Based on the evidence before the Court, the undersigned finds that Temple has not met his burden of standing. Accordingly, Temple is not entitled to suppression of the evidence from the (314) 203-9177 account. Nonetheless, because the issue of standing is at least debatable, the undersigned will consider the remaining issues and the validity of the search. See Marshall, 2008 WL 2775857, *6.

## 2.    <u>Expectation of Privacy in Non-Content Information</u>

The government submitted a spreadsheet containing the records received pursuant to the warrant directed at the (314) 203-9177 account.  (Gov't Exh. 1B)  Those records are denominated as call detail and do not include the contents of any communications.[35]  The records cover a time period from March 27, 2015, to April 1, 2015.  Most of the basic call detail information consists of records that phone companies routinely gather and which can be produced pursuant to a subpoena or court order without any showing of probable cause.  <u>See</u> 18 U.S.C. § 2703(c)(2).[36]  Such information routinely falls squarely within the third-party doctrine; a warrant is not required because a person lacks a reasonable expectation of privacy in information voluntarily given to or independently created by a third-party.  <u>See</u> <u>Smith v. Maryland</u>, 442 U.S. 735, 742-43 (1979); <u>United States v. Fregoso</u>, 60 F.3d 1314, 1319 n.3 (8th Cir. 1995).  Because there was no Fourth Amendment search, there was no basis to suppress any basic subscriber information provided pursuant to the warrant directed at the (314) 203-9177 account.

The records included in Gov't Exh. 1B also reflect historical cell tower location information, which has been referred to herein Cell Site Location Information ("CSLI").  Cellular carriers create and maintain CSLI data in the regular course of their businesses.  Such data is neither created nor maintained by the subscriber.  As noted above, however, the issue of

---

[35] The search warrant for the (314) 203-9177 account focused on historical information.  Accordingly, the most likely type of content information disclosed would have been voicemail messages or text messages.  The records provided to the Court, however, do not include any such content.

[36] Pursuant to 18 U.S.C. § 2703(c)(2) basic subscriber information can be obtained by State or federal authorities pursuant to a subpoena, court order, or warrant.  Under § 2703, when judicial authorization is required (e.g., a court order or search warrant), the required process is to be issued by "a court of competent jurisdiction."  "[T]he term 'court of competent jurisdiction' includes -- … a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants."  18 U.S.C. § 2711(3)(C).

historical CSLI data is currently before the Supreme Court, and the Court will likely decide whether and when the police must have a warrant to obtain historical CSLI data from cellular providers.  See United States v. Carpenter, 819 F.3d 880 (6th Cir. 2016), cert. granted, 137 S. Ct. 2211 (June 5, 2017).  The Eighth Circuit has not had occasion to affirmatively decide the issue. At the present time, the federal courts of appeals that have considered the question, including the Sixth Circuit in Carpenter, have generally concluded that gathering CLSI from a cellular provider does not amount to a Fourth Amendment search requiring a warrant.  See United States v. Graham, 824 F.3d 421, 427 (4th Cir. 2016); Carpenter, 819 F.3d at 890; United States v. Davis, 785 F.3d 498, 513 (11th Cir.) (en banc), cert. denied, 136 S. Ct. 479 (2015); In re Application for Historical Cell Site Data, 724 F.3d 600, 615 (5th Cir. 2013); In re Application for Order Directing Provider to Disclose Records, 620 F.3d 304 (3d Cir. 2010) (holding that, to compel historical CSLI, the government had a burden less than probable cause).  The undersigned has found no contrary decisions that are binding on this Court.  Therefore, the undersigned concludes that Temple lacked any expectation of privacy in the historical CSLI records obtained by the police in this case.

Accordingly, the undersigned finds that there was no Fourth Amendment search with respect to the basic subscriber and CSLI data produced pursuant to the warrant directed to the (314) 203-9177 account.  Therefore, Temple is not entitled to suppression of such evidence.

### 3.    Violations of Missouri Constitution and Criminal Procedure

Temple also argues that evidence should be suppressed because the warrant directed to the (314) 203-9177 account violated Missouri law.  Even if the warrant was issued in violation of Missouri law, Temple is not entitled to suppression on that basis.  Federal law, not Missouri law, governs the admissibility of evidence in this matter.  See United States v. Hornbeck, 118 F.3d 615, 617 (8th Cir. 1997); United States v. Rollins, 2011 WL 940359 (W.D. Mo. Feb. 15, 2011)

(quoting Hornbeck), report and recommendation adopted, 2011 WL 940205 (W.D. Mo. Mar. 16, 2011).   Absent a showing of a Fourth Amendment violation, Temple is not entitled to suppression in this cause.  See Faulkner, 826 F.3d at 1146 (citation omitted); see also United States v. Grady, 2010 WL 4415313, *6 (E.D. Mo. Feb. 4, 2010) (explaining that suppression is not an available remedy for non-constitutional violations of 18 U.S.C. § 2703) (citing 18 U.S.C. § 2708).

### 4.    Good-Faith

Having concluded that no Fourth Amendment search occurred, it is not necessary to decide whether the application and warrant directed to the (314) 203-9177 account satisfied the Fourth Amendment requirements of probable cause and particularity.  Nonetheless, the Court will also consider the question of the good-faith exception to the exclusionary rule.  See United States v. Warford, 439 F.3d 836, (8th Cir. 2006) (considering "the applicability of the good-faith exception to the exclusionary rule" before considering probable cause because, "[i]f the officers acted in good-faith reliance on a warrant, then there is no need to visit the underlying question of probable cause") (citation omitted); see also Jackson, 784 F.3d at 1231 (citation omitted).

"Under the good-faith exception, evidence seized pursuant to a search warrant later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable."  Jackson, 784 F.3d at 1231.  Reviewing courts consider "the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant."  Id.  (citations omitted).  This good-faith exception to the exclusionary rule, however, does not apply in the following situations:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

(2) when the issuing judge "wholly abandoned [the] judicial role" in issuing the warrant;

(3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and

(4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

Id. at 1231 (quoting Leon, 468 U.S. at 923).

There is no meaningful contention that the affidavit or other information provided with the warrant application was false or incorrect, or that the Det. Sweeney omitted information that rendered the application misleading. Thus, Det. Sweeney did not intentionally or recklessly mislead the issuing judge. Second, there is no basis on this record to conclude that the issuing judge wholly abandoned the judicial role. The face of the application indicates that Det. Sweeney and an Assistant Circuit Attorney (i.e., a prosecutor for the City of St. Louis, Missouri) appeared before the issuing judge. Both Det. Sweeney and the prosecutor signed the application and affidavit. These facts are significant because they indicate that Det. Sweeney consulted with and relied upon a prosecutor when submitting this warrant application. Third, Det. Sweeney's affidavit recites facts and circumstances which reflect a reasonable probability that phone number (314) 203-9177 was connected to the murders and shooting on March 27, 2015, even if one might conclude that the information fell short of probable cause. For example, Det. Sweeney's affidavit outlined how he came to learn of the (314) 203-9177 phone number, including that it was a number found in a shooting victim's phone log. Det. Sweeney's affidavit also represented that phone records he obtained relative to a missing phone from one of the murder victims reflected a number of calls and texts to/from that victim's phone and the number (314) 203-9177 in the hours leading up to the homicide. Such information provides at least

arguable probable cause to support the issuance of the search warrant.[37]  The undersigned cannot say that the affidavit was so lacking in indicia of probable cause as to render the issuing judge's conclusion regarding probable cause unreasonable.  Finally, Temple has not identified any facial defects in the warrant that would have rendered Det. Sweeney's reliance on the warrant unreasonable.

Based on the facts and circumstances before the Court, the undersigned finds that the good-faith exception under <u>Leon</u> applies and it is unnecessary to consider Temple's remaining challenges to the search warrant directed to the (314) 203-9177 account.

## CONCLUSION AND RECOMMENDATIONS

Accordingly,

**IT IS HEREBY RECOMMENDED** that Temple's Motion to Suppress Statements [ECF No. 228] be DENIED.

**IT IS FURTHER RECOMMENDED** that Temple's Motion to Suppress Identification [ECF No. 229] be DENIED.

**IT IS FURTHER RECOMMENDED** that Temple's Motion to Suppress Evidence [ECF No. 231] be DENIED.

---

[37] In passing on the issues of probable cause and particularity, the undersigned does not intend to suggest that the warrant and application were defective.  Rather, a detailed consideration of those issues is simply not required due to the nature of the information received (entirely non-content information) and the fact that Det. Sweeney's good faith can be readily determined on this record.

The parties are advised that they have fourteen (14) days in which to file written objections to this Memorandum, Order, and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

The trial of this matter is set for November 27, 2017, at 9:00 a.m., before the Honorable John A. Ross, United States District Judge.


/s/ **John M. Bodenhausen**
UNITED STATES MAGISTRATE JUDGE

Dated this  6th   day of  October  , 2017